THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v. JOHN A. NICOLL and IRVAN A. FREDERICKS, Appellants.

Fourth Department, December 19, 1956.

*George G. Fiesinger* for Irvan A. Fredericks, appellant.
*Harold E. Blodgett* for John A. Nicoll, appellant.
*Albert W. Schneider, District Attorney,* for respondent.

VAUGHAN, J. These are appeals by both defendants from judgments of conviction of manslaughter in the first degree and assault in the third degree. The case was tried at great — it seems to us excessive — length before the County Court of Herkimer County. The defendants were found guilty on all counts of the indictment (except the second, which was dismissed on the trial), and they appeal to this court, assigning numerous errors and causes for reversal.

We deem it unnecessary to discuss the evidence in detail. There was evidence tending to establish that the defendants, who were young men of previously unblemished reputation, had gone on a hunting trip and had been drinking rather heavily. In the course of their journey they observed two cars stopped along the road. Various persons, including the decedent, one Charles Friel, were engaged in an argument, the precise nature and background of which it is not important to relate. The defendants stopped their automobile and joined in the dispute. They maintained upon the trial that one of the disputants represented himself to be a deputy sheriff, indicated that he was having some trouble with Friel regarding the latter's driver's license, and departed in search of a state trooper. It was then and there — in the early morning of November 15, 1953, on highway number 8 in the county of Herkimer — that the defendants are charged by the fifth count of the indictment with assault in the third degree (Penal Law, § 244) in that they did "push, shove, hold and threaten the said Charles Friel with a black-jack without cause or provocation." At the conclusion of this alleged assault, the decedent either escaped from the restraint of the defendants or was freed by them, entered his car and drove away.

Shortly thereafter the defendants again encountered the Ford automobile operated by Mr. Friel. At the sight of them he fled. They gave chase, the defendant Fredericks driving. In his statement, offered in evidence by the People, the defendant Nicoll related: "We chased the Ford automobile down the road. He was weaving and cutting in and out. For some reason that stuck in my mind I felt that we must stop that car. I reached over and got my rifle from the back seat or the floor of the back seat and put three cartridges in it. I rolled down the right side window and leaned out the window and took aim with the rifle and fired the three shots at the Ford car that we were following. The car weaved and hit the soft shoulder on the left side of the road and tipped over." In his statement the defendant Fredericks related that he " started to chase this

car. I don't remember what we were chasing this car for or what we intended to do if we caught it but drove after this car in an effort to stop it. I caught up to the car at one time and tried to pass it so as to stop the car but the driver pulled over to the left side of the road so I couldn't get by. I saw John with one of the rifles out of the side window and then heard the rifle being fired several times and think John may have fired it about four times at the car we were chasing. He had the gun pointed in the direction of the car we were chasing." Fredericks further stated: "When John was shooting at this car, I was driving and I did not stop the car or try to stop the car after the first shot. I believe there was a few seconds interval between the shots he fired at this car and I would have had time to slow down and stop if I had cared to before he fired all of the shots. I did not say anything to John when he fired the shots at the car or did I tell him to stop shooting." We are satisfied that the defendant Fredericks could properly be regarded as a principal.

The Grand Jury for Herkimer County returned an indictment containing four counts charging manslaughter, first degree. The second count was dismissed on the trial. The fifth count charged assault, third degree, and is discussed above. The first count alleged that, without a design to effect death, defendants killed Friel while engaged in committing a misdemeanor affecting the person of Friel and the property of one Remonda, who owned the automobile operated by the decedent (Penal Law, § 1050, subd. 1). The misdemeanor alleged was the willful and unlawful discharge of a firearm in a public place (Penal Law, § 1906). The third count similarly charged " misdemeanor — manslaughter ", the misdemeanor alleged being the willful damaging of a motor vehicle (Penal Law, § 1425, subd. 11-a). And the fourth count alleged that defendants, in the heat of passion and without a design to effect death, killed Charles Friel by means of a dangerous weapon (Penal Law, § 1050, subd. 2). There was no indictment for manslaughter in the second degree arising out of culpable negligence (Penal Law, § 1052, subd. 3).

While it is impossible, without extending this opinion to undue lengths, to discuss all of the numerous errors assigned upon this appeal, we desire to consider whether the venue was correctly laid in Herkimer County, so far as the manslaughter counts are concerned, and whether those counts should have been dismissed. It will also be necessary to refer to certain events which occurred upon the trial, certain remarks made by the District Attorney in his summation to the jury, and various

features of the court's charge which we are unwilling to approve. While the above is by no means exhaustive of the errors assigned by appellants — and as to points not discussed we of course express no opinion — we are confident that upon a new trial reversible error will be avoided by the high regard for the rights of the accused which the law expects every District Attorney to possess and to observe.

The first question which must be determined is that of venue. The learned Trial Judge evidently misspoke when, in his charge to the jury, he referred to venue as a " defense that has been interposed here by these defendants ". As he correctly charged, the People had the burden to introduce evidence from which venue could be fairly and reasonably inferred (*People* v. *Hetenyi,* 277 App. Div. 310, affd. 301 N. Y. 757). It was not an easy matter to prove. The chase commenced in Herkimer County and extended into Hamilton County. The weight of evidence is probably to the effect that the shots were fired in Hamilton County, but whether within 500 yards of the boundary is unclear (Code Crim. Pro., § 135). The automobile operated by decedent came to a halt eight tenths of a mile from the county line. He was removed to a hospital in Herkimer County, where five days later he died. In support of jurisdiction the People relied upon section 134 of the Code of Criminal Procedure: " When a crime is committed, partly in one county and partly in another, or the acts or effects thereof, constituting, or requisite to the consummation of the offense, occur in two or more counties, the jurisdiction is in either county." The language of section 134, when read both literally and reasonably, seems to sustain the jurisdiction of the county where death occurred. There was an act in Hamilton County, producing an effect in Herkimer County, and the two collectively constituted the crime of manslaughter. An indispensable element of the crime transpired in Herkimer County, and as was stated in a quite similar case (*Hauk* v. *State,* 148 Ind. 238, 247), " jurisdiction over a crime exists where any one or more of its substantive and material parts are committed." Regarding only the language of section 134, we would be inclined to hold that where an assault in one county produces death in another, " the jurisdiction is in either county." And that is true even though at the time of the assault the victim and the assailant are in the same county. If cases arise — and this is not one of them — in which the application of the rule would work an injustice or burden the accused in the preparation of his case, we have no doubt that a motion to change the venue to the county of concurrent jurisdiction would be entertained.

Study of the legislative history of section 134 confirms our belief that it means what it says. At early English common law, where an assault in one county produced death in another, it was doubted whether either county had jurisdiction (see *Stout v. State,* 76 Md. 317, and authorities cited; 1 Wharton on Criminal Law [12th ed.], § 339). To resolve these doubts a statute was enacted in 1548 (2&3 Edw. VI, ch. 24) which, after reciting that "it often happeneth * * * that a Man is feloniously stricken in one County, and after dieth in another County, in which Case it hath not been founden by the Laws or Customs of this Realm, that any sufficient Indictment thereof can be taken in any of the said two Counties," since the jurors in neither county had knowledge of the entire crime, enacted "That where any Person or Persons hereafter shall be feloniously stricken or poisoned in one County, and die of the same Stroke or Poisoning in another County, that then an Indictment thereof founden by Jurors of the County where the Death shall happen * * * shall be as good and effectual in the Law, as if the Stroke or Poisoning had been committed and done in the same County where the Party shall die, or where such Indictment shall be so founden; any Law or Usage to the contrary notwithstanding."

The first treatment of the subject in New York occurred at the 24th session of the Legislature (L. 1801, ch. 60, "An act regulating certain proceedings in criminal cases", passed March 21, 1801; 1 Kent & Radcliff, Rev. Laws [1802], p. 260, § V). That statute is identical with the Act of 2&3 Edw. VI. As the provision was carried over into the Revised Statutes of 1829 ([vol. 2], part IV, ch. II, tit. IV, § 47) it read: "When any mortal wound shall be given, or any poison shall be administered, or any other means shall be employed, in one county, by which a human being shall be killed, who shall die thereof in another county, an indictment for such offense may be found in the county where such death happened; and the same proceedings shall be had thereon in all respects, as if the means by which such death was produced, had been employed and used in the county where such death happened."

In 1849 the Commissioners on Practice and Pleadings reported a proposed Code of Criminal Procedure, section 131 of which was substantially the same as present section 134. The commissioners' note (p. 63) referred to the provision of the Revised Statutes of 1829, quoted *supra,* and to the report of the Massachusetts commissioners, who in 1844 had reported a proposed Penal Code, section 4 of chapter III of which was substantially identical with our section 134. Explaining the purpose of the

section, the Massachusetts commissioners had referred to cases "where goods, stolen in one county, are, directly upon the taking thereof, carried away by the thief into another. Or where a mortal wound is given or poison is administered in one county, and death consequent thereon ensues in another." The Code of Criminal Procedure was not enacted into law until 1881. That same year, and as of a time when section 47 (part IV, ch. II, tit. IV) of the Revised Statutes (*supra*) was still law, the General Term of the fourth department decided *People* v. *Swan* (26 Hun 240, digest in 13 N. Y. Week. Dig. 519). The defendant had performed an abortion in Monroe County. His victim died in Ontario County. It was held that an indictment was properly returned in the latter county. Against that background section 134 became law. For over three centuries, in England and in New York, by explicit legislative enactment the county in which death occurred had enjoyed a jurisdiction concurrent with that in which the blow was given and received. The principle embodied in the earlier statutes, until 1881 limited to homicide indictments, was by the enactment of section 134 approved and extended to cases of crime generally. That statute was an extension and not a rejection of what had gone before. And the broadening of the principle was accomplished by language suitable to the purpose in view. We believe that the statutory background of section 134 would have to be ignored, and the statutory language distorted, if the county of death were to be held lacking in jurisdiction.

We are persuaded, therefore, that the manslaughter counts of the indictment may not be dismissed for want of jurisdiction in the Grand Jury to return the same. Directing their arguments towards the legal sufficiency of the indictment, appellants next contend that the first and third counts should have been dismissed, and they invoke the doctrine of merger. It is now settled that " the rule as to merger should be, and is, the same in manslaughter, first degree, as in felony murder " (*People* v. *Vollmer,* 299 N. Y. 347, 350). It was held in that case that an assault upon the decedent merges in the homicide and will not support a conviction for manslaughter in the first degree (Penal Law, § 1050, subd. 1). The same idea has frequently been applied in " felony-murder " cases (*People* v. *Spohr,* 206 N. Y. 516; *People* v. *Lazar,* 271 N. Y. 27; *People* v. *Moran,* 246 N. Y. 100, 102). In the last-cited case CARDOZO, Ch. J., explained the rule on the ground that, if it did not apply, every felonious homicide would be felony-murder; proof of a deliberate and premeditated intent to kill would never be necessary. He

expressed the rule as follows: " The felony that eliminates the quality of the intent must be one that is independent of the homicide and of the assault merged therein, as, *e.g.*, robbery or larceny or burglary or rape." Thus it appears that the doctrine of merger, while not required by the strict letter of the law, was devised by the courts to preserve the good sense and order of the homicide statutes. In the absence of such a doctrine, every felonious assault resulting in death would be a case of murder in the first degree, even if the killing were done in the heat of passion and without a design to effect death. Other sections of the Penal Law (see, e.g., § 1044, subd. 1; § 1050, subd. 2), presumably not intended by the Legislature to be superfluous, would then be void of meaning. The doctrine of merger forestalls such obliteration of the statutory scheme.

In *People* v. *Hüter* (184 N. Y. 237, 244) the defendant killed an officer in the course of an escape. The assault was relied upon to support a conviction of felony-murder. Section 242 (subd. 5) of the Penal Law defines assault, second degree, to include an assault " with intent    *    *    *    to prevent or resist    *    *    *    the lawful apprehension or detention of himself ". Such an intent, of course, is not a necessary element of any degree of felonious homicide. Nevertheless, it was held that a violation of subdivision 5 of section 242 would not support a conviction of murder in the first degree. Judge HAIGHT observed that " the *gist* of the offense is the assault ", which merged in the homicide, and he concluded: " In order, therefore, to constitute murder in the first degree by the unintentional killing of another while engaged in the commission of a felony, we think that while the violence may constitute a part of the homicide, yet the other elements constituting the felony in which he is engaged must be so distinct from that of the homicide as not to be an ingredient of the homicide, indictable therewith or convictable thereunder."

Subdivision 1 of section 1906 of the Penal Law reads in part as follows: " A person who, otherwise than in self defense, or in the discharge of official duty: a. Wilfully discharges any species of fire-arms    *    *    *    in a public place    *    *    *    Is guilty of a misdemeanor." We are unable to perceive how, consistently with the doctrine of merger, a violation thereof could be held to support a conviction for manslaughter in the first degree. The willful discharge of the firearm, constituting a violation of section 1906, was the very act which produced the death. It was simply the means by which the assault was committed — the assault under a different name. As was stated in

*People* v. *Hüter* (*supra*), " the *gist* of the offense is the assault ", which merges in the homicide, as has frequently been held. If this were not so, subdivision 2 of section 1050 of the Penal Law would be deprived of much of its content, for in every case of felonious homicide caused by the willful discharge of a firearm, such discharge would itself have been criminal if death had not resulted. If the mere act of pulling the trigger were a sufficient foundation for a " misdemeanor-manslaughter " conviction under subdivision 1 of section 1050, then it would be unnecessary for the People to resort to the following paragraph, which defines as a distinct variety of manslaughter in the first degree a homicide committed, without a design to effect death, " In the heat of passion, but in a cruel and unusual manner, or by means of a dangerous weapon." If the willful discharge of a firearm were such a misdemeanor as would support a conviction for manslaughter in the first degree (§ 1050, subd. 1), then no showing of heat of passion would ever be required, and as a practical matter subdivision 2 of section 1050 would be inapplicable to homicides perpetrated by means of a firearm. It would apply only to homicides committed in a cruel and unusual manner, or by means of a dangerous weapon other than a gun. We see no reason for so restricting the coverage of that important statute, and the doctrine of merger may be invoked to prevent such an anomaly. The first count of the indictment should have been dismissed for want of an independent misdemeanor.

We do not agree with appellants, however, that the third count of the indictment is similarly defective. The misdemeanor relied upon therein is a violation of section 1425 of the Penal Law: " A person who wilfully: * * * 11-a. With intent so to do, damages in any manner an automobile or other motor vehicle * * * Shall be deemed guilty of a misdemeanor ". The evidence sufficiently establishes the commission of that crime. It is a well-settled rule that every man is presumed to intend the natural consequences of his own acts. When the defendant Nicoll, intending as he said to stop the automobile ahead, pointed a loaded firearm at it and fired several shots, the natural consequence was damage to the car, and a jury could find that such a result was intended. Such a misdemeanor is distinct from the homicide and does not merge therein. While the same act of violence was common to both the homicide and the misdemeanor, the latter involved a distinct unlawful purpose unrelated to the assault and the death (*People* v. *Hüter*, *supra*, p. 244). By one act two crimes may be committed. Thus,

where an attempt to ravish produces death, the crime is raised to murder in the first degree (*People* v. *Harris,* 306 N. Y. 345). So, in the present case, the intent to damage the automobile operated by the decedent is no part of the assault upon his person; it is not " an ingredient of the homicide, indictable therewith or convictable thereunder." (*People* v. *Hüter, supra.*) We have no doubt that the motion to dismiss the third count was correctly denied.

The fourth count of the indictment alleges that defendants, " without design to effect death, in the heat of passion * * * shot Charles Friel by means of a dangerous weapon ". Appellants question the legal sufficiency of this count upon the ground that, as stated in their brief, " There can be no ' heat of passion ' homicide unless the elements of murder exist and the crime, except for the existence of ' heat of passion,' would be murder." But this contention, elaborately presented by counsel, is quickly and completely answered by the language of section 1050 itself : " Such homicide is manslaughter in the first degree, when committed *without a design to effect death* ". (Italics added.) So the fourth count is clearly sufficient as a criminal pleading. Appellants contend further, however, that there was no evidence that the killing was committed in the heat of passion. That element of manslaughter in the first degree, being a state of mind, must often rest upon inferences to be drawn by the jury (*People* v. *Lewis,* 282 App. Div. 267, 271). There was evidence of a quarrel, an assault, a lengthy and exciting chase, and the firing of several shots. We are unable to say that there was no evidence of a homicide in the heat of passion, in the sense of unreasoned and impulsive action produced by overpowering emotion. On the other hand, there was also evidence that the killing was the result of a rational purpose to warn the decedent and stop his automobile, or that it was a senseless act induced by intoxication. As there must be a new trial, it is unnecessary now to determine where the weight of evidence lies. This is particularly so in view of the charge of the trial court, which defined heat of passion as " passion or anger suddenly aroused at the time by some immediate and reasonable provocation by words or acts of another at the time." This instruction was, in our opinion, erroneously favorable to the defendants, in requiring the People to prove beyond a reasonable doubt " some immediate and reasonable provocation ", but it became the law of the case, and we must hold that there was no evidence of any words or conduct of the decedent which could be construed as reasonably provoking an ordinary man to take human life. The

People did not prove what the instruction required them to prove, so it is plain that the jury disregarded either the charge or the evidence. Upon a new trial, the question of heat of passion may be determined initially by the jury upon proper instructions, and if there should be a conviction, it will then be soon enough to decide whether the verdict accords with the weight of evidence.

The preceding adequately records our opinion regarding the jurisdiction of the trial court and the legal sufficiency of the various counts of the indictment. With respect to the conduct of the trial, it is quite impossible to discuss the numerous incidents which have received our attention. But we desire to say generally that in our opinion the trial was unnecessarily long. The defendants were entitled to a speedy trial (Code Crim. Pro., § 8). This one commenced on November 19, 1954, and the verdict was received on January 13 of the following year. The record contains nearly 6,000 pages. We see no reason why the case could not have been presented more expeditiously, with less burden on everyone concerned, if the hard core of relevant facts alone had been regarded. We are also constrained to agree with appellants that at times the District Attorney may have passed the bounds of legitimate advocacy, and may have asked questions and made statements calculated to excite prejudice against them by reason of their wealth, social status, or family background. Finally, in the middle of the testimony of the defendant Fredericks, an 18-day recess was called because of the illness of the District Attorney. This action was taken with the consent of all parties, and it cannot be considered cause for reversal. Nevertheless, it was a serious matter to declare so long a recess, and to permit the jury to separate, in the midst of a manslaughter trial which was the subject of considerable notoriety. Before a trial judge permits such a thing to be done he should be very sure of his ground. We do not criticize the taking of the recess in this case, no motion for a mistrial having been made, but we must state our opinion that a homicide trial, once commenced, should so far as is reasonably practicable proceed expeditiously and continuously to a conclusion.

One incident occurred upon the trial which requires some comment. The fifth count of the indictment charged the defendants with the crime of assault in the third degree, committed in the county of Herkimer upon the person of Charles Friel. This alleged assault occurred some time before the homicide. One Richard Remonda, a boy of 18, testified in support of the

fifth count. On his direct examination he testified that the defendants pushed Friel back and forth, and that the defendant Fredericks had threatened him with a " blackjack ": " Well, he held it up kind of in his face and was shaking it and kept asking him, how would he like to have that over his head." On cross-examination, however, Remonda volunteered the information that Friel had been struck with the blackjack. The indictment contains no such averment, merely alleging that defendants did " push, shove, hold and threaten the said Charles Friel with a blackjack without cause or provocation." Since the witness had testified before the Grand Jury, defense counsel moved that the Grand Jury minutes be examined by the court in order to ascertain whether they should be made available to counsel for the purpose of cross-examination. That motion having been denied, a further motion was then made that counsel be permitted to examine a statement given by the witness to the State police. The court replied, " If it is in court, you may have it." The District Attorney conceded the existence of the statement but announced that it was not in court, whereupon the Trial Judge indicated that the correct remedy was to subpœna the statement.

The cross-examination of Remonda then continued. Asked why he had not earlier testified that Friel had been struck with the blackjack, he answered, " I didn't remember about the blackjack then." Asked whether he had given such testimony before the Grand Jury, Remonda replied that he believed he had but was not sure. As to whether he had told that story to the District Attorney, the witness stated, " I think so   *   *   * Well, I don't remember for sure   *   *   * I am not positive." But he testified that he had informed the state police that Fredericks had struck Friel with a blackjack. At this point it must have been highly doubtful whether the testimony was not a fabrication. It was not brought out on the direct examination of the witness, and he was uncertain whether he ever stated before the Grand Jury that Fredericks had struck Friel with a blackjack. If such testimony had been before the Grand Jury and had been believed by them, an indictment for assault in the second degree could have been returned (Penal Law, § 242, subd. 4; *People* v. *Wagner*, 245 N. Y. 143). The indictment, however, was for simple assault and contained no allegation that the decedent had been struck with a dangerous weapon. There was good reason to suspect, therefore, that the testimony given by Remonda upon the trial varied in a material particular from what he had told the Grand Jury, and if that were so,

the contents of the statement which he gave to the state police would have been a legitimate subject of inquiry.

Counsel for defendants, in response to the apparent suggestion of the Trial Judge, served upon the District Attorney a subpœna calling for the statements of Remonda and another prosecution witness and the transcript, in question and answer form, of the story related by Friel while in the hospital. Both the statements and the transcript were clearly hearsay and inadmissible in evidence. In the presence and hearing of the jury, the District Attorney announced his refusal to obey the subpœna, which he considered illegal, but he consented that the statements and the transcript '' be admitted into evidence, read to this jury, and that counsel be permitted to cross-examine the witnesses by using the statements.'' Asked by the court whether they accepted this offer, defense counsel of course rejected it, whereupon the District Attorney observed that the statements and transcript — which, we repeat, under no circumstances were competent — '' may be admitted into evidence, and the only thing that would keep them out would be the objection of the defendants * * * We have nothing to fear. We are willing to put everything we have got into evidence. And if there is anybody who has anything to fear, it would be apparent who it might be, but not the People.''

In our view this episode involved two errors which, in the context of the entire record and in view of numerous other errors, cannot be lightly passed over as technical or unsubstantial: (1) the court should have examined the Grand Jury testimony and the statement of the witness Remonda in order to determine whether defense counsel should have been permitted to employ them in impeaching his credibility upon cross-examination (*People* v. *Pauley,* 281 App. Div. 223, 225; *People* v. *Walsh,* 262 N. Y. 140, 149; *People* v. *Dales,* 309 N. Y. 97, 103). In the latter case, it is stated that counsel for the defense may employ a statement or the minutes of grand jury testimony for the purpose of cross-examining a witness if '' the court, upon inspection, had found that they contained material at variance with the testimony given by the particular witness on the stand.'' We think the trial court, confronted with a strong possibility or likelihood that Remonda's testimony — volunteered for the first time on cross-examination — varied from that which he gave before the Grand Jury, should have examined both the Grand Jury minutes and the statement furnished to the state police. If there was a discrepancy, if the testimony of Remonda was in part a fabrication, defense

counsel in all fairness should have had every opportunity to expose it. There was, it is true, other evidence of the alleged assault, but we are unwilling to speculate that the jury was unaffected or unmoved by testimony that defendants brutally struck with a blackjack an unarmed and defenseless man. If the force of such testimony could be impaired by assailing the credibility of the witness who offered it, it was the right of the defendants to do so; and equally the duty of the trial court to inspect the Grand Jury minutes and the statement in order to determine whether there was basis for the effort. (2) The error was, in our opinion, magnified when the District Attorney endeavored, with probable success, to convey to the jury the idea that the full truth was being withheld from them by the defendants and not by the People, who had '' nothing to fear.'' The documents in question were inadmissible in evidence, and it was scarcely fair to offer to permit defense counsel to see them on condition that they be read to the jury. We have had occasion quite recently to condemn trial tactics of that sort (*People* v. *Brown*, 2 A D 2d 202).

In his summation the District Attorney seems to have resorted, from time to time, to the sort of over-zealous advocacy that has frequently been condemned by the courts of this State (*People* v. *Slover*, 232 N. Y. 264). It was unnecessary to inquire whether '' people riding along Route 8 in the Town of Ohio can be shot down like sitting ducks and Route 8 become a playground for the so-called big shots and wise guys and yet nothing be done about it.'' This was followed by a reference to the defendants as '' the wise guys, if you please, the big shots, if you please, from Scotia.'' The District Attorney then suggested that the defendants passed their evenings '' building up a tolerance, if you please, for liquor '', and finally offered his opinion that the decedent '' was probably closer to God than these defendants have ever been throughout their entire life.'' That was not, in our opinion, fair comment upon the evidence; rather, the District Attorney was stressing matters which were not at all in issue and which may have prejudiced the jury against the defendants. If it was done for that purpose, we will not say that it did not have that effect.

The District Attorney, in submitting the case to the jury, further stated: '' After hearing the People's witnesses here in court, after hearing the defendants' testimony on the stand, my conviction of the defendants' guilt no longer remains a belief but has become an absolute certainty which must in all fairness be shared by you.'' This was an improper expression

of opinion (*People* v. *Burley*, 282 App. Div. 408, 411; cf. *People* v. *Tassiello*, 300 N. Y. 425). The District Attorney followed that up with a plea that the jury " give me and the People of the State of New York justice." There was no occasion for such a request. Mr. Schneider was not a party to the action, and the jury should have considered the case without regard to what was fair to him. " Throwing the prestige of his own person and position into the balance was a weighted foul blow by the District Attorney." (PECK, P. J., dissenting in *People* v. *Lovello*, 1 A D 2d 162, 169.) The *Lovello* case was reversed in the Court of Appeals, where Judge DESMOND condemned " practices by any prosecutor in making himself an unsworn witness and supporting his case by his own veracity and position " (1 N Y 2d 436, 439).

The charge of the trial court was quite lengthy, consuming some four hours exclusive of requests, and we believe that the learned Trial Judge from time to time digressed into matters which it was unnecessary to consider and which may well have confused the jury. Thus, there was no occasion to recite the organization and function of the Grand Jury, composed of " persons who are of approved integrity, fair character, sound judgment and well informed." As the court correctly stated to the jury, an indictment is no evidence of guilt, and instruction as to the Grand Jury could not assist the jurors in deciding the case. For the same reason, it was not important to read the second count of the indictment, which as the jury were reminded had been dismissed upon the trial. It could not, therefore, enlighten them regarding the issues remaining for their decision. Similarly, the court should not have read to the jury the statutes defining murder in the first and second degrees (see *People* v. *Smith*, 285 App. Div. 590, 591). That may have tended to magnify the crime in the minds of the jurors, or to confuse them by the introduction of various elements — such as deliberation, premeditation, and the design to effect death — which had no bearing on the case. Equally irrelevant was the explanation of the law pertaining to dueling. If it had been thought necessary to clarify the crime of manslaughter by distinguishing it from murder, that could have been accomplished quickly and simply by stating that it was unnecessary for the People to prove an intent to kill.

The court similarly erred in instructing the jury regarding assault in the first degree and indicating that defendants could possibly be convicted of that crime. There was no evidence to warrant submission of that question to the jury. The court

then read the definitions of assault in the second and third degrees and concluded, in language that does not appeal to us, that "anybody is guilty of assault [third degree] who does anything that isn't called assault first degree or second degree with relation to another individual." We think the court should have explained third degree assault directly and affirmatively, and not just by exclusion of other crimes for which the defendants were not on trial.

Three times during his charge the learned Trial Judge referred to manslaughter in the first degree as a killing in the heat of passion and in a cruel and unusual manner. At the conclusion of his instructions, he reminded the jurors that if they found that defendants killed Friel "in the heat of passion but in a cruel and unusual manner or by means of a dangerous weapon, you may bring in a verdict of manslaughter in the first degree." The fourth count of the indictment alleged a killing in the heat of passion and by means of a dangerous weapon. There was no allegation of a homicide in a cruel and unusual manner, and it was error to submit that question to the jury. While no exception was taken to the charge in that respect, the defendants were absolutely entitled to be tried according to the allegations of the indictment, and the court should not, after the proofs were closed, have introduced a new theory of manslaughter.

The judgments of conviction should be reversed and a new trial ordered. The first count of the indictment should be dismissed.

All concur. Present — McCurn, P. J., Vaughan, Kimball, Williams and Bastow, JJ.

Judgments of conviction reversed on the law and facts and a new trial granted. First count of the indictment dismissed.