**Russell E. CARTER, Appellant,**

v.

**UNITED STATES of America,**
Appellee.

No. 13222.

United States Court of Appeals
District of Columbia Circuit.

Argued Nov. 19, 1956.

Judgment Entered Dec. 20, 1956.

Opinion Filed Oct. 24, 1957.

Petition for Rehearing In Banc Denied
Nov. 21, 1957.

Mr. Bernard Margolius, Washington, D. C. (appointed by this Court), for appellant.

Mr. Lewis Carroll, Asst. U. S. Atty., with whom Mr. Oliver Gasch, U. S. Atty., and Messrs. Frederick G. Smithson and Donald E. Bilger, Asst. U. S. Attys., were on the brief, for appellee.

Before PRETTYMAN, BAZELON and BURGER, Circuit Judges.

PRETTYMAN, Circuit Judge.

Carter was indicted, tried, convicted, and sentenced to death for first-degree murder. We have heretofore, shortly after the oral argument in this court, ordered that the judgment of conviction be reversed and that Carter have a new trial.

At the time of the offense Carter was eighteen years of age. His alleged victim was a girl fifteen years old. The trial consumed thirteen days over a period of four weeks. The transcript, which we have examined with care, is some fifteen hundred pages long.

The prosecution rested upon confessions made by Carter, some physical evidence (bloody clothing) said to belong to Carter, and a few circumstances. The defense was insanity; the defense also opposed admission of the confessions.

Four doctors testified at the trial as experts. Fifteen witnesses testified concerning Carter's life history, his personality, habits and attitudes. These witnesses included Carter's father, three foster parents, a case worker for the Board of Public Welfare, six employees of the Industrial Home School, a social worker at the Children's Center, a counselor at the Receiving Home, and two shorttime employers of Carter.

Born illegitimate, Carter spent the first seven or eight years of his life with his father's sister, a blind woman. Shortly before his eighth birthday he was hit by a car. He was taken to Freedman's Hospital, where his symptoms were described as a comatose condition, convulsive seizures, and grinding of the teeth. Hemorrhage was noted from the right ear, and there were lacerations on the forehead. His father testified that after the accident "Sometimes he would answer people when people wouldn't be calling him, and then get out and you could call him and he wouldn't answer at all." And further, in response to the question, "Was he still jolly and playful?," his father answered, "Not much after that. He wouldn't do much talking after that."

A year after the accident Carter's aunt released him to the Child Welfare Division of the Department of Public Welfare. He was forced to leave his first foster home. After six months at a second foster home he was placed with a Mr. and a Mrs. Reed, with whom he stayed almost four years. The Reeds found him extremely difficult. He relieved himself in his clothing and bedclothing "just as regularly as if it were the right thing." He often struck smaller children without provocation; he was extremely cruel to animals—put a cat in a sewer and tried to strangle a dog; and he stole food. It was not uncommon for him to stay out all night, and on occasion he left home for as much as eight or ten days. At these times he slept in pool halls, garages, and the neighboring woods.

Carter left the Reeds in August, 1949, and went to the Industrial Home School at Blue Plains. While there he forced a child into an act of sodomy, threw a knife at another child, and was in the habit of fighting with smaller children who would not give him their possessions. His behavior there was characterized as aggressive and hostile. Upon reaching the age of sixteen (in December, 1952) Carter was placed in another foster home. He stayed there only a short time and then went to live with a Mrs. Gordon, who requested the authorities to remove him from her home after he masturbated in her presence.

Thereafter Carter moved to still another foster home for about one month, after which he was again placed in yet another foster home where he remained for three days and then ran away. He was found seventeen days later sleeping in a garage and was removed to the Receiving Home for Children. He subsequently left the Receiving Home to live with his father, remaining there about one month. His father testified that Carter absconded with a hundred dollars. He was apprehended on a complaint charging "disorderly conduct or peeping tom" and was sent back to the Receiving Home. By this time Carter had grown to be a large physical specimen. While at the Receiving Home he picked up another boy bodily and threw him on the floor, causing injuries serious enough to require hospitalization. His explanation was that the boy had been looking at him. His nature had become so vicious that he required constant supervision.

On June 21, 1954, when he was about seventeen and a half years old, Carter was sent to Gallinger Hospital by the Department of Public Welfare for a determination as to whether he was at that time of unsound mind. While there he was given an I.Q. test, on which he scored 74—"borderline intelligence".

The report, if there was one, of the psychiatric examination was not put in the record, and there is no testimony by a doctor as to the results of such an examination at that time. The social worker testified, however, that as a result of the report from Gallinger the Department filed a "Beyond control petition" with the Juvenile Court. The petition stated that Carter had "a considerable amount of aggressive hostility", that he "acted impulsively", and that "we felt he would perhaps get into some difficulty because of his mental abilities—his inability to make use of community resources, his inability to plan for himself". The social worker testified: "And there were no other relatives who showed any interest in him whatsoever and we did not believe that he should be continued in the community. We felt that he should be placed in an institution." The petition to the Juvenile Court stated further that the difficulties Carter had been in and his behavior indicated that perhaps there was a mental illness. The petition was denied on the basis that Carter "should be able to go out into the community and learn to take care of himself even though [the Department] did not feel that he was able to do this."

Carter stayed at the Receiving Home until his eighteenth birthday, December 30, 1954, when the commitment to the Department of Public Welfare automatically expired. After his eighteenth birthday a social worker, knowing that Carter had no place to live, helped him find a place in the Municipal Lodging House, where he lived for about two and a half weeks. The social worker discussed with Carter the possibility of an army career, and Carter attempted to enlist. He was unable to pass the mental examination, however, and was rejected.

He was seen in April, 1955, by the social worker who had had much to do with him and by one of his former foster parents. He was disheveled and appeared confused. "He looked terrible. Glassy-eyed. And he looked very upset. * * * He was glassy-eyed and staring, starry-eyed—I don't know—it was an expression of a person that when I left him I said to myself, 'I wonder if he had been using dope.' * * * And I said to myself, 'Nuts,' because that is just the way he looked." In June, 1955, he was indicted for murder in the first degree.

The psychiatrists were presented as Government witnesses on rebuttal. The examinations of three doctors had been made at the District Jail after Carter was indicted. One of them testified the electroencephalogram was negative; it showed no abnormal findings; there was no neurological damage. "The intelligence tests showed this man to be a person of dull, normal to average intellectual ability. It was with an intelligence quotient of 83. * * * dull normal * * * definitely within the normal area but below average". The doctor observed no evidence of psychotic behavior, no unusual mannerisms; Carter's emotional reaction "was appropriate to the situation and did not show any abnormality"; there was no evidence of hallucinations or delusions; he "was precisely oriented in all spheres"; his memory showed no impairment. The doctor found in Carter no "mental disease, psychosis" and no evidence of mental defect. The testimony of two other doctors was similar to the foregoing. One said, "I felt he was what we call a schizoid personality, * * * a sort of lonely, withdrawn fellow who keeps pretty much to himself".

One doctor had examined Carter for a few minutes at the Receiving Home in December, 1954. He cautioned that his examination was not a thorough psychiatric evaluation but said that he saw nothing which would lead him to believe Carter was of unsound mind; he felt Carter was "extremely aggressive, hostile".

We will discuss six points which arise upon this appeal.

I

■■ The trial began on Wednesday, January 18, 1956. The jury was selected and sworn. The prosecutor began his opening statement and had gone so far

as to identify the defendant and to describe the indictment when the proceeding was interrupted with a message, which informed the prosecutor of the death of his father. Thereupon the court recessed until Tuesday, January 24th. The court excused the jury for this recess period but did not give them the admonition that they must not communicate with any person relative to the trial or read or listen to accounts of the trial.

The court erred when it failed to admonish the jury as they were released to return to their homes during the recess in the trial, particularly as the recess was as extensive as this one was. The question whether the court ought to permit the jury in a capital case to separate during the trial was for many years a question of great doubt in this jurisdiction. Under the common law the jurors in such cases were required to be confined, and for many years that was the practice in the District of Columbia. But the matter was finally decided in 1921 in McHenry v. United States,[1] where this court held that the trial court had a discretion to permit the jury to separate in a homicide case. In so holding the court quoted from an opinion written by Mr. Chief Justice Alvey for the Maryland Court of Appeals[2] where he said: "Of course, the separation should only be allowed when attended with those precautions and safeguards necessary to secure entire freedom from approach or external influence of any kind." In Brown v. United States[3] the question was again raised in this court, and after some discussion we said:

"We adhere to our decision in the McHenry Case, but in saying this we deem it not improper to draw forcibly to the trial court's attention that the discretion which we hold exists should be exercised with the greatest circumspection, especially in prosecutions for capital offenses. And in all criminal cases whenever jurors are permitted to separate, the court should invariably admonish them not to communicate with any person or allow any person to communicate with them on any subject connected with the trial, and not to read published accounts of the course of the trial."

The language we then used, "the court should invariably admonish them", imposed upon the trial courts a requirement.

On Tuesday, February 7, 1956, the court excused the jury "until tomorrow morning at the usual time" without admonition. The record indicates that there was then a bench conference and adjournment to "10 a. m. Wednesday, February 8, 1956." But the record indicates that the proceedings did not resume until Monday, February 13, 1956. Thus it appears that for a second time the jury was separated for almost a week without admonition.

## II

The court instructed the jury:

"If upon the whole of the evidence, you find that there are two equally balanced hypotheses, inconsistent one with the other, a hypothesis consistent with guilt, on the one hand, and a hypothesis consistent with innocence on the other, you must take the one most favorable to the defendant * * *. If you find that these inconsistent theories are in balance, you must acquit, because to establish guilt, any reasonable hypothesis of innocence, any reasonable hypothesis of innocence, must be excluded by the evidence."

██ The foregoing instruction was erroneous. This court has held many times that the rule for the jury is that, unless there is substantial evidence of facts which exclude every reasonable

1. 51 App.D.C. 119, 276 F. 761, 34 A.L.R. 1109.

2. Stout v. State, 76 Md. 317, 330, 25 A. 299, 303 (1892).

3. 69 App.D.C. 96, 99 F.2d 131 (1938), certiorari denied, 305 U.S. 562, 59 S.Ct. 97, 83 L.Ed. 354 (1938).

hypothesis but that of guilt, the verdict must be not guilty, and that, where all the substantial evidence is consistent with any reasonable hypothesis of innocence, the verdict must be not guilty.[4] It is not necessary to a verdict of acquittal that on the basis of the facts established a hypothesis of innocence be as likely as one of guilt; any reasonable hypothesis of innocence must be excluded by the facts. The last clause in the above-quoted portion of the instruction was correct, but the earlier portions left the matter in complete confusion, if indeed they did not entirely negative the import of the final clause.

### III

Carter was indicted in three counts. The first count was for deliberate and premeditated murder, the second for murder committed in the course of a housebreaking, and the third for housebreaking alone. The court instructed the jury: "Your verdict can't be different on the second and third counts, as I see it, because defendant cannot be guilty of the second count unless he is also guilty of the third because they merge." While it would have been correct to say that if the jury found the accused guilty of the second count it would follow that he must be found guilty of the third count, the converse is not correct. The jury might have found him guilty of the third count, that is, of housebreaking alone, without finding him guilty on the second count, that is, of murder committed in the course of housebreaking. The court's charge that the verdict could not be different on these two counts because they merged was clearly erroneous.

### IV

The offense alleged in this case was discovered at about six forty-five on the evening of May 31, 1955. Acting

upon information as to Carter's probable whereabouts a police officer and a witness who could identify Carter searched for him. They located him at about eight o'clock. Without a formal arrest the detective asked Carter to accompany him. They drove to the scene of the crime. Carter remained in the car while the detective received further instructions. They were at this place not more than fifteen minutes. Accompanied by another officer they drove to Police Identification Headquarters, arriving at about eight-thirty. Carter was given certain tests for blood on his hands and garments. Either just before or just after these tests Carter was "booked". Thereafter the officers drove with Carter to the morgue, arriving at about nine or nine-thirty o'clock. The officers testified that up to this point the case was not discussed with Carter. The group stayed at the morgue an appreciable length of time—one officer said until ten-thirty, and another said until eleven-thirty. One officer testified that he talked to Carter for some twenty minutes while at the morgue. He said he noted scratches on Carter's face and spots of what appeared to be blood on his clothing. Carter denied any participation in the crime. The group returned to Police Headquarters, and an officer testified he talked to Carter for some thirty minutes. Carter was shown a bloody shirt found at the scene of the crime. Several officers questioned him. At about twelve-thirty in the morning, according to the testimony of one of the officers, Carter said he had gone to the victim's home and pushed the door open and that she had run into the bathroom and had fallen into the bathtub, hitting her head. He said he took about a dollar out of a piggy bank and a shirt and some other clothing. He said he threw the shirt away but could find it and would do so. He was then returned to the scene of the crime,

4. E. g., McGuinn v. United States, 89 U.S. App.D.C. 197, 199, 191 F.2d 477, 479, (1951). See also United States v. Dolasco, 184 F.2d 746, 748 (3 Cir., 1950); Beckman v. United States, 96 F.2d 15, 16 (5 Cir., 1938); Vernon v. United States, 146 F. 121, 123 (8 Cir., 1906). Cf. Curley v. United States, 81 U.S.App.D.C. 389, 394, 160 F.2d 229, 234 (D.C.Cir. 1947), certiorari denied, 331 U.S. 837, 67 S.Ct. 1511, 91 L.Ed. 1850 (1947).

arriving about one o'clock. After a few minutes they drove to a nearby address where Carter said he had taken some clothing from a clothesline. Several other stops were made pursuant to suggestions from Carter. Upon their return to the scene Carter "was asked if he would" reenact the crime. He did so. This was between one-thirty and two-thirty in the morning. There is some testimony which characterized the conversation at Headquarters at midnight as a confession. Carter was returned to Headquarters and after about thirty minutes questioning at about three o'clock or shortly thereafter began to make a full statement which was typed as he talked. After several interruptions the written statement was concluded at about seven-thirty in the morning. Carter remained in the squadroom at Headquarters until about ten or ten-thirty when the Deputy Coroner came and examined him for about an hour. At about noon he was taken to the United States Commissioner and arraigned.

Except for dozing in a chair in the squadroom Carter had no sleep during the time taken with the foregoing. He had some food. So far as appears he was not advised as to his right to counsel or the right not to speak, except in so far as these advices are in the opening paragraph of the written confession.

The oral statements, the reenactment, and the written confession were admitted in evidence at the trial.

We see no escape from the conclusion that these confessions were inadmissible under the ruling of the Supreme Court in Mallory v. United States.[5]

## V

We come now to the instructions on insanity. The trial court recited the rule promulgated by this court in Durham v. United States,[6] analyzing it into two parts, the presence of a mental disease or defect and the causal connection between the disease and the criminal act. Then the court said: "In order for you to find the defendant not guilty by reason of insanity, you must find [the two requirements]." And again the court said:

"In order for you to acquit on the ground of insanity, you must find both of these elements present. It is not sufficient for you to find merely that the defendant was suffering from a diseased or defective mental condition when he committed the offense. You must find that the act was the result, the product of the mental abnormality."

Of course a court cannot state the whole of its instruction in any one sentence; the purport of the whole of the instruction is the controlling consideration. It is from that viewpoint that we think the instruction given in this case was at least confusing. It failed to spell out an essential element of the requisite proof.

The court emphasized the theme that, in order to acquit, the jury must reach certain findings. Somewhat later the court told the jury the burden was on the Government to prove sound mind beyond a reasonable doubt. But the purport of the instruction, and the clear impression left by it, was that, in order to acquit, the jury must reach affirmative conclusions of mental disease and the causal connection between the disease and the act.

When the issue of insanity is properly raised by evidence, as it was in this case, the burden is on the Government to prove sanity beyond a reasonable doubt. This has been the rule in the federal courts ever since the Davis case[7] was decided by the Supreme Court in 1895. The opinion in that case was unanimous and was long, careful and exhaustive. In it Mr. Justice Harlan ana-

5. 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957).

6. 94 U.S.App.D.C. 228, 214 F.2d 862, 45 A.L.R.2d 1430 (1954).

7. Davis v. United States, 160 U.S. 469, 16 S.Ct. 353, 40 L.Ed. 499.

lyzed the then-conflicting schools of thought on the burden of proof in cases involving insanity and wrote a conclusion upon it for federal courts. The courts of our jurisdiction had already taken the same view. In the famous Guiteau's Case [8] Judge Cox of the Supreme Court of the District of Columbia wrote for that court that, if there be in the jury's mind a reasonable doubt as to "the responsible condition of mind," the defendant was entitled to acquittal. So in this jurisdiction for some seventy-five years it has been the law that once the issue of insanity is raised the prosecutor must establish sanity beyond a reasonable doubt. The trial court in the present case should have instructed the jury clearly to that effect.

General terms such as "issue as to sanity", or "not of sound mind", or "insane" are the terms we and all others habitually use, but they are not always accurately used or understood. To claim exemption from responsibility for a criminal act an accused must assert two conditions: (1) that he suffered from a mental disease or defect and (2) that his alleged criminal act was the product or result of that disease or defect. When this defense is raised, the response of the Government may be one or the other (or both alternatively) of two propositions: (1) that the accused had no mental disease or defect or (2) that even if the accused had a mental disease or defect the alleged criminal offense was not the product of the infirmity. The burden is upon the Government to establish beyond a reasonable doubt whatever position it (the Government) takes upon the issue. In order to convict, the jury must be convinced beyond a reasonable doubt either (1) that the accused had no mental disease or defect or (2) that, although the accused was defective or diseased, his act was not the product of the affliction. Or, to state the matter otherwise, the jury must acquit unless it is convinced beyond a reasonable doubt that the alleged criminal act was not the product of a mental disease or defect. We spelled this out in detail in Durham, supra.

## VI

Further with respect to insanity the court instructed:

"As to the second requirement, that the act in question was the product of the mental abnormality, you may wonder what the Court means by the term 'product.'

"By this term 'product' or 'causal connection,' you are told that the criminal act must be the consequence, a growth, natural result or substantive end of a mental abnormality or unsoundness in order for the defendant to avail himself of the defense of insanity.

"The criminal act of the defendant, if you find he did the act, must have resulted or been produced by the unsoundness of his mental condition, not in a minor or nominal way, but in the sense of being in direct relation to and the consequence of the diseased or defective mental condition."

The foregoing instruction was not adequate or sufficiently accurate. While we think it alone did not constitute reversible error we are constrained to discuss the subject, inasmuch as the case must be retried. And in any event this is a proper opportunity for further discussion of the rule laid down in the Durham case.

The phrases "product of" in Durham and "except for" in Douglas [9] were not attempts to phrase in a single expression a rule as to insanity in criminal cases. Such a single phrase would be an impossible task. The matter must be explained, not merely stated.

The simple fact that a person has a mental disease or defect [10] is not

---

8. 10 F. 161, 163 (D.C.1882).

9 Douglas v. United States, 99 U.S.App. D.C. 232, 239 F.2d 52 (1956).

10. Hereafter for simplicity's sake we will say simply "disease", but in so doing we mean to include "defect".

enough to relieve him of responsibility for a crime. There must be a relationship between the disease and the criminal act; and the relationship must be such as to justify a reasonable inference that the act would not have been committed if the person had not been suffering from the disease. There are two key factors in this defense, (1) a mental disease and (2) a critical relationship between that disease and the alleged criminal act.

If the disease produces a mental derangement of such character as necessarily to influence the accused's every action, there is no further problem. The problem we face comes from illness of lesser scope, what the authorities of a century ago called "partial insanity".

A bit of underlying philosophy and history is helpful. A common-law crime consists of an act and a vicious mind prompting the act. The common-law axiom was *"Actus non facit reum, nisi mens sit rea."* The basic import of the criminal law is punishment for a vicious will which motivates a criminal act.[11] To understand the defense of insanity one must keep constantly and clearly in mind the basic postulate of our criminal law—in the words of Dean Pound, quoted by Justice Jackson in Morissette,[12] "a free agent confronted with a choice between doing right and doing wrong and choosing freely to do wrong." If a man is *"amens (id est) sine mente"* in respect to an act to such an extent that in doing the act he is not a free agent, or not making a choice, or unknowing of the difference between right and wrong, or not choosing freely, or not acting freely, he is outside the postulate of the law of punishment.[13] An insane man is not held responsible, because he has not a criminal mind in respect to the act he committed.[14] That philosophy has never changed, and it is not proposed to change it now. The problem over the years—and the problem now—is not one of philosophy. It is one of translating the accepted philosophy into practical rules of action for everyday use in the courtroom.

In this jurisdiction the rule as to insanity had become sloganized by many years of use into a combination "right-wrong and irresistible impulse" test. The latter was established for us in 1929 by the Smith case.[15] But "impulse" carries a connotation of suddenness, and we know there are many readily recognizable diseases of the mind which do not involve sudden impulses,— slow deterioration, brooding, depressions, constant pressures, etc. Medical knowledge in the field of mental illness has moved ahead in the last hundred years. The Durham case merely extended the established rule to apply the defense to all acts which would not have been committed except for a mental illness of the accused. In Douglas, supra, we explained this meaning. It was a short, simple step, inevitable and evolutionary after the opinion of this court in Smith. It applied in the light of modern psychiatric knowledge the basic philosophy of the common law.

When we say the defense of insanity requires that the act be a "product of" a disease, we do not mean that it must be a direct emission, or a proximate creation, or an immediate issue of the disease in the sense, for example, of Hadfield's delusion that the Almighty had directed him to shoot George III. We do not mean to restrict this defense to such cases; many mental diseases so affect areas of the mind that some or all of the mental elements requisite to criminal liability under the law are lacking. We mean to include such cases.

11. See Morissette v. United States, 342 U.S. 246, 250, 72 S.Ct. 240, 96 L.Ed. 288 (1952).

12. Ibid.

13. Experience and science have, of course, caused us long ago to reject the idea that exculpation is only for the individual who is indeed "without mind", like a wild beast.

14. See, for example, 1 Bishop, Criminal Law § 376 (9th ed.)

15. Smith v. United States, 59 App.D.C. 144, 36 F.2d 548, 70 A.L.R. 654.

When we say the defense of insanity requires that the act be a "product of" a disease, we mean that the facts on the record are such that the trier of the facts is enabled to draw a reasonable inference that the accused would not have committed the act he did commit if he had not been diseased as he was.[16] There must be a relationship between the disease and the act, and that relationship, whatever it may be in degree, must be, as we have already said, critical in its effect in respect to the act. By "critical" we mean decisive, determinative, causal; we mean to convey the idea inherent in the phrases "because of", "except for", "without which", "but for", "effect of", "result of", "causative factor"; the disease made the effective or decisive difference between doing and not doing the act. The short phrases "product of" and "causal connection" are not intended to be precise, as though they were chemical formulae. They mean that the facts concerning the disease and the facts concerning the act are such as to justify reasonably the conclusion that "But for this disease the act would not have been committed."

To the precise logician deduction of the foregoing inference involves a tacit assumption that if the disease had not existed the person would have been a law-abiding citizen. This latter is not necessarily factually true and can rarely, if ever, be proved, but in the ordinary conduct of these cases we make that tacit assumption. For ordinary purposes we make no mention of this logician's nicety.

Mental "disease" means mental illness. Mental illnesses are of many sorts and have many characteristics. They, like physical illnesses, are the subject matter of medical science. They differ widely in origin, in characteristics, and in their effects on a person's mental processes, his abilities, and his behavior. To make a reasonable inference concerning the relationship between a disease and a cer-

tain act, the trier of the facts must be informed with some particularity. This must be done by testimony. Unexplained medical labels—schizophrenia, paranoia, psychosis, neurosis, psychopathy—are not enough. Description and explanation of the origin, development and manifestations of the alleged disease are the chief functions of the expert witness. The chief value of an expert's testimony in this field, as in all other fields, rests upon the material from which his opinion is fashioned and the reasoning by which he progresses from his material to his conclusion; in the explanation of the disease and its dynamics, that is, how it occurred, developed, and affected the mental and emotional processes of the defendant; it does not lie in his mere expression of conclusion. The ultimate inferences *vel non* of relationship, of cause and effect, are for the trier of the facts.

 Durham was intended to restrict to their proper medical function the part played by the medical experts. Many psychiatrists had come to understand there was a "legal insanity" different from any clinical mental illness. That of course was not true in a juridical sense. The law has no separate concept of a legally acceptable ailment which *per se* excuses the sufferer from criminal liability. The problems of the law in these cases are whether a person who has committed a specific criminal act—murder, assault, arson, or what not—was suffering from a mental disease, that is, from a medically recognized illness of the mind; whether there was a relationship between that specific disease and the specific alleged criminal act; and whether that relationship was such as to justify a reasonable inference that the accused would not have committed the act if he had not had the disease. The law wants from the medical experts medical diagnostic testimony as to a mental illness, if any, and expert medical opin-

16. This is the manner of stating the defense. The burden of proof in respect to this defense, once it is raised, is on the Government. So the issue to be put to the jury, as we later indicate, is whether the Government has met this defense beyond a reasonable doubt.

ion as to the relationship, if any, between the disease and the act of which the prisoner is accused. The conclusions, the inferences, from the facts are for the trier of the facts. All this Smith v. United States implied and Durham was meant to bring about.

■ In discussing, as we have, expert medical testimony, we have not overlooked the admissibility of lay testimony. Lay witnesses may testify upon observed symptoms of mental disease, because mental illness is characterized by departures from normal conduct. Normal conduct and abnormal conduct are matters of common knowledge, and so lay persons may conclude from observation that certain observed conduct is abnormal. Such witnesses may testify only upon the basis of facts known to them. They may testify as to their own observations and may then express an opinion based upon those observations. Of course the testimony of a lay witness with training in this or related fields may have more value than the testimony of a witness with no such training. Also obvious upon a moment's reflection is the fact that, while a lay witness's observation of abnormal acts by an accused may be of great value as evidence, a statement that the witness never observed an abnormal act on the part of the accused is of value if, but only if, the witness had prolonged and intimate contact with the accused.

■ A trial judge faced with a defense of insanity in a criminal case ought not attempt to be brief or dogmatic. He ought to explain—not just state by rote but explain—the applicable rules of law and the duties of the jury in respect to the matter. He should explain not only in general terms but in terms applicable to the disease and the act involved in the case at bar. Because, after all, the jury must make its findings upon the facts in the case before it, not in some nebulous generality of supposition.

Generally speaking, in order to return a verdict of guilty notwithstanding a defense of insanity, the jury must find (1) that beyond reasonable doubt the accused is free of mental disease; or, if the finding is "No, he may have a mental disease," then (2) that beyond reasonable doubt no relationship existed between the disease and the alleged criminal act which would justify a conclusion that but for the disease the act would not have been committed. A converse statement of the proposition, i. e., a statement of the requisites for the converse verdict of not guilty by reason of insanity, requires the use of double negatives and so, perhaps, is not clear. We made such a statement in Durham, and it necessarily involved the use of "Unless" and three "not"s. What we meant there, and what we mean here, is: "If you believe beyond a reasonable doubt either that he was not suffering from a diseased or defective mental condition or that the act was not the product of such abnormality, you may convict."

In remanding this case for a new trial we do not reach the question whether the jury must necessarily have had a reasonable doubt as to Carter's sanity. Our discussion here is directed entirely to the instructions under which the issue was submitted to the jury for its consideration.

An order reversing the judgment of conviction having already been entered, this opinion is for the guidance of the District Court upon a new trial. In the event a new trial is not sought, the District Court would be well advised, in view of the facts shown in this record, which we have recited, to consider the initiation through the proper authorities of the proceedings under Title 21, Sections 311 et seq., of the District of Columbia Code, relating to persons incapable by reason of mental condition to manage their own affairs or not fit to be at large or go unrestrained, etc.