602 A.2d 1232

**William Orville TRINDLE, III and Sharon Marcus,**

v.

**STATE of Maryland.**

**No. 127 Sept. Term, 1990.**

Court of Appeals of Maryland.

March 16, 1992.

Eldridge, J., concurred in part, dissented in part, and filed opinion in which Rodowsky, J., and Marvin H. Smith, Judge of the Court of Appeals (retired, specially assigned), concurred.

**26**

Elise Davis, Chestertown, for appellant.

Gary E. Bair, Asst. Bar Counsel (J. Joseph Curran, Jr., Attorney General, both on brief), Baltimore, for appellee.

Argued before MURPHY, C.J., ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW and KARWACKI, JJ., and MARVIN H. SMITH, Judge of the Court of Appeals (retired,) Specially Assigned.

KARWACKI, Judge.

A jury in the Circuit Court for Kent County (Boyer, J.) convicted William Orville Trindle, III, of violating Maryland Code (1984), § 9–305 of the Family Law Article [1] and Md.

---

1. Subtitle 3 of the Family Law Article, *Removal of Child from State; Child Abduction,* provides in pertinent part:

"**§ 9–301. Definitions.**
   (a) *In general.*—In this subtitle the following words have the meanings indicated.
   (c) *Relative.*—"Relative" means:
      (1) a parent;
      (2) a grandparent or other ancestor;
      (3) a brother;
      (4) a sister;
      (5) an aunt;
      (6) an uncle; or
      (7) an individual who was a lawful custodian before the commission of an act that violates § 9–304 or § 9–305 of this subtitle."
"**§ 9–305. [Prohibited Acts]—Outside of this State.**

Code (1957, 1987 Repl.Vol.) Article 27, § 2.[2] Sharon Marcus, who was tried jointly with Trindle, was also convicted of violating Article 27, § 2. Following their sentencing, both Trindle and Marcus appealed those judgments to the Court of Special Appeals. Before the cases were heard by

---

If a child is under the age of 12 years, a relative who knows that another person is the lawful custodian of the child may not:

(1) abduct, take, or carry away the child from the lawful custodian to a place outside of this State;

(2) having acquired lawful possession of the child, detain the child outside of this State for more than 48 hours after the lawful custodian demands that the child be returned;

(3) harbor or hide the child outside of this State knowing that possession of the child was obtained by another relative in violation of this section; or

(4) act as an accessory to an act prohibited by this section."

**"§ 9–307. Penalties.**

*(b) Violation of § 9–305—Not more than 30 days.*—If the child is out of the custody of the lawful custodian for more than 30 days, a person who violates any provision of § 9–305 of this subtitle is guilty of a felony and on conviction is subject to a fine not exceeding $250 or imprisonment not exceeding 30 days, or both.

*(c) Same—More than 30 days.*—If the child is out of the custody of the lawful custodian for more than 30 days, a person who violates any provision of § 9–305 of this subtitle is guilty of a felony and on conviction is subject to a fine not exceeding $1,000 or imprisonment not exceeding 1 year, or both."

2. Article 27, § 2 provides:

"Any person who shall without the color of right forcibly abduct, take or carry away any child under the age of twelve years from the home or usual place of abode of such child, or from the custody and control of the parent or parents, or lawful guardian or guardians of such child, or be accessory thereto, or who shall without such color of right and against the consent of the parent or parents or lawful guardian or guardians of such child, persuade or entice from the usual place of abode or house of such child, or from the custody and control of the parent or parents, or guardian or guardians of such child, or be accessory thereto, or shall knowingly secrete or harbor such child, or be accessory thereto, with the intent to deprive such parent or parents, guardian or guardians, or any person who may be in lawful possession of such child, of the custody, care and control of such child, shall be guilty of a felony, and upon conviction shall suffer imprisonment in the penitentiary for a term not exceeding twenty years, in the discretion of the court.

For the purposes of this section, the terms 'usual place of abode', 'home', and 'house' include the real property appurtenant thereto."

the intermediate appellate court, we issued a writ of certiorari on our own motion.

The prosecution of Trindle and Marcus was based upon facts that were undisputed at trial.

Trindle and his wife, Alexa Matthai, separated in August of 1987. Matthai was granted a limited divorce by the Circuit Court for Kent County on December 31, 1987. Custody of their three children, Jamila (born on January 1, 1980), Jamal (born on December 2, 1981), and Alia (born on January 6, 1985), was granted to Matthai. Trindle was allowed reasonable visitation with his children.

Matthai continued to reside in the family home at Betterton in Kent County with the children. On March 1, 1989, the Circuit Court for Kent County entered a judgment absolutely divorcing Trindle and Matthai. The court continued the custody of the children in Matthai, allowing Trindle reasonable visitation.

During the spring of 1989, Matthai and Trindle had made arrangements for the children to visit Trindle on weekends. He was then living in Overbrook, Pennsylvania, with his new wife, Sharon Marcus. Matthai would drive to Wilmington, Delaware, on Fridays, where she and the children would be met by Trindle. The children would then join their father for the trip to his home. On Sundays, Trindle and Matthai would again meet in Wilmington where Trindle would return the children to their mother for their return to their Kent County home.

At Trindle's request, Matthai agreed to an extended weekend visit from Thursday, May 11, through Sunday, May 14, on Trindle's representation that he was taking the children to a special event in Philadelphia. On May 11, Matthai and the children met Trindle in Wilmington. Trindle agreed to telephone Matthai on the morning of May 14 and advise her of the time they would meet to transfer the children that afternoon. Matthai then returned home.

At 9:30 p.m. on Saturday, May 13, Trindle telephoned Frances Matthai, an aunt of his ex-wife, who lived in

Baltimore County. He asked her to advise Matthai that he would not be returning the children. This information was immediately relayed to Matthai who began a frantic effort to locate Trindle and the children. She enlisted her lawyer and the Maryland State Police to help her, but the whereabouts of Trindle and the children could not be ascertained.

It was later learned that on May 13, Trindle, Marcus and the children left on an airplane from Kennedy Airport in New York to fly to Amman, Jordan. The tickets for this trip had been purchased on April 24, 1989, by Marcus with her own funds.

Soon after the children arrived in Amman, Jordan, Frances Matthai received a telephone call from Jamila, the eldest of the children. Jamila assured her that she and her brother and sister were well and advised her how they could be contacted by telephone. Frances Matthai immediately advised her niece of this information.

Matthai then placed a telephone call to the number she had been furnished. Trindle answered the telephone. When Matthai demanded the return of the children, Trindle advised her that he had conditions to doing so. He insisted that they renegotiate the property settlement that they had reached at the time of their absolute divorce. He also wanted joint custody of their children. Finally, he demanded that she deposit between $6,000 and $8,000 in his checking account. During repeated telephone conversations which Matthai had with Trindle until the end of September, he maintained these positions.

In the course of her attempts to persuade Trindle to return the children, Matthai also had occasion to speak with Marcus. At trial, Matthai recalled that when she spoke with Marcus, "the big question I put to her is 'Why are you financing this? These are my children. And you may think you are not involved but you are the reason that they are there.' Because Bill didn't have any money and she had the money." Matthai's pleas were unavailing.

Corporal Frank Ford of the Maryland State Police, who was assigned the investigation of the abduction of the children, learned on September 25, 1989, from the State Department of the United States that Trindle, Marcus and the children had been deported from Jordan and ordered to return to the United States and that their airplane from Jordan was due to land at Kennedy Airport in New York on September 29. Matthai, in the company of Corporal Ford, traveled to New York to meet that flight. Matthai regained the custody of her children, and Trindle and Marcus were arrested and returned to Kent County.

### *Trindle*

In his appeal Trindle contended that the Circuit Court was without jurisdiction to hear his prosecution for child abduction since none of his conduct took place in Maryland. Alternatively, he asserted that § 9–305 of the Family Law Article "pre-empted the field of parental kidnapping, thereby invalidating his convictions under Article 27, § 2." Prior to his case being argued, Trindle died. Consequently, all issues he had raised are moot. Since at the time of his death he had not had the one appeal from his convictions to which he was statutorily entitled, his convictions and sentences shall be vacated, and the cases remanded with directions to dismiss the criminal informations filed against him as moot. *Jones v. State*, 302 Md. 153, 158, 486 A.2d 184, 187 (1985).

### *Marcus*

In her appeal, Marcus also challenges the jurisdiction of the trial court and, alternatively, argues that since she was merely an "aider and abettor" of Trindle, she cannot be convicted under Article 27, § 2, because that statute was pre-empted by § 9–305 of the Family Law Article utilized in Trindle's prosecution for parental kidnapping.

### (1)

In *Pennington v. State*, 308 Md. 727, 521 A.2d 1216 (1987), we had occasion to uphold the jurisdiction of a

Maryland circuit court to hear a prosecution for obstruction of justice prohibited by Md.Code (1957, 1982 Repl.Vol.) Article 27, § 27. There, Pennington stabbed another woman in the District of Columbia to dissuade her from testifying in a criminal case pending in Baltimore City.

We observed that Md.Code (1974, 1984 Repl.Vol.), § 1–501 of the Courts and Judicial Proceedings Article provides that each circuit court "has full common-law and equity powers and jurisdiction in all civil and criminal cases within its county, and all the additional powers and jurisdiction conferred by the Constitution and by law, except where by law jurisdiction has been limited or conferred exclusively upon another tribunal." 308 Md. at 728, 521 A.2d at 1216. Since neither the Constitution nor the Code of this State addressed jurisdiction over the offense of obstructing justice, we looked to the common law to resolve the jurisdictional issue. *Id.* at 729–30, 521 A.2d at 1216–17. We recognized that generally a state may only punish those crimes committed within its territorial limits, but where the various elements of a given offense do not occur entirely within the borders of any one state, it is necessary to decide in which state or states the crime has been committed. *Id.* at 730, 521 A.2d at 1217. We held that at common law a crime is committed in the state where the criminal act (or omission) occurs if the crime is defined only in terms of that act (or omission) but a crime will also be considered as committed in the state where its intended result occurs if the definition of the crime includes such a result. *Id.* at 730–34, 521 A.2d at 1217–19. Consequently, we explained that in the latter instance the accused need not be present in the state where the result of his criminal act occurs. *See id.* at 731–33, 521 A.2d at 1218–19. Applying this rationale to the crime of obstruction of justice, we concluded that causing or attempting to cause a particular result formed an essential ingredient of obstruction of justice proscribed by Article 27, § 27. *Id.* at 734, 521 A.2d at 1219. Accordingly, since the intended result of Pennington's act in the District of Columbia was the obstruction of justice in Maryland, we held that

the circuit court in Maryland had jurisdiction to punish that crime. *Id.* at 746, 521 A.2d at 1225.

We hold that the *Pennington* analysis supports the jurisdiction of the Circuit Court for Kent County in the instant case. Marcus's conduct which constituted a violation of Article 27, § 2 consisted of knowingly secreting and harboring Matthai's children with the intent to deprive Matthai of the custody, care and control of those children. It is clear that the intended result of that conduct, i.e. depriving Matthai of custody, forms an essential ingredient of her offense and had its effect in Kent County, Maryland, although the acts which produced that result took place outside of this State. Consequently, under the common law of Maryland interpreted in *Pennington,* the Maryland circuit court had jurisdiction to try Marcus for the crimes and to punish her for them.

We believe the better reasoned authority elsewhere supports our conclusion. In *People v. Harvey,* 174 Mich.App. 58, 435 N.W.2d 456 (1989) defendant took his daughter for visitation in 1978 but failed to return her to his ex-wife in Michigan, who had been granted custody of the child at the time of the parties' divorce. It was not until 1986 that the child was located in Colorado and returned to her mother. Defendant was prosecuted in Michigan under a 1983 statute which proscribed parental kidnapping. The court held that Michigan had territorial jurisdiction over the offense, reasoning:

> "In this case, defendant had a legal duty to return his daughter to her mother. His failure to perform this duty, which was made criminal by the enactment of MCL 750.350a; MSA 28.582(1), should be considered a crime committed within the State of Michigan. Acts done outside a state which are intended to produce, and in fact do produce, detrimental effects within the state may properly be subject to the criminal jurisdiction of the courts of that state. The detrimental effects of defendant's intentional retention of the girl in violation of the Michigan court's custody order occurred here, in Michigan, since it

was the authority of a Michigan court that was thwarted and it was the custodial right of a Michigan resident that was infringed upon."

*Id.* at 61, 435 N.W.2d at 457 (footnote omitted).

In *Wheat v. State*, 734 P.2d 1007 (Alaska Ct.App.1987), defendant was prosecuted for violation of a custodial interference statute which prohibited a non-custodial relative of a child from keeping that child from a lawful custodian with intent to hold the child for a protracted period. Defendant and wife had been divorced in 1983 at which time the Alaska divorce court awarded custody of their daughter to the wife, granting summer visitation to defendant. In June of 1985, the daughter traveled from her mother's home in Alaska to spend the summer with defendant in Arizona. Defendant refused to return child and was convicted of custodial interference. In rejecting defendant's contention that the Alaska court was without jurisdiction over that crime since all of his criminal conduct took place in Arizona, the Court of Appeals of Alaska reasoned:

"Wheat contends that Alaska law forbids the extraterritorial application of its criminal statutes. Criminal jurisdiction in Alaska is governed by AS 12.05.010, which provides:

*Crime commenced outside state but consummated inside.* When the commission of a crime commenced outside the state is consummated inside the state, the defendant is liable to punishment in this state even though out of the state at the time of the commission of the crime charged, if the defendant consummated the crime through the intervention of an innocent or guilty agent, or by other means proceeding directly from the defendant.

Wheat reads this provision to be strictly territorial, requiring the commission of a criminal act within the confines of the state. Because the conduct for which he was convicted—unlawfully keeping his daughter in Arizona, away from the lawful custody of her mother in Alaska—occurred entirely outside the state, Wheat ar-

gues that his offense was not 'committed' in Alaska and that jurisdiction never attached under AS 12.05.010.

We disagree with Wheat's interpretation of this statute. Although AS 12.05.010 is primarily territorial in its approach to criminal jurisdiction, its terms are broader than Wheat suggests. The plain language of the statute permits the assertion of jurisdiction over crimes 'consummated inside the state.' Wheat equates the word 'consummate' with the commission of some criminal act—with some element of the requisite *actus reus* of the offense. In our view, however, the word 'consummate' requires a broader reading. In its common meaning, consummation denotes completion. In many instances, of course, a crime is completed upon commission of the last element of the required *actus reus*. Where, however, a statute, in addition to prohibiting conduct, includes within its definition of the offense a specific result, then the crime is not completed until that result occurs. And if the prohibited result occurs in a place other than the conduct which occasioned it, the location of the result may fairly be deemed the place where the crime is 'consummated.' "

*Id.* at 1008–09. (emphasis in original).

In *Rios v. State*, 733 P.2d 242 (Wyo.), *cert. denied*, 484 U.S. 833, 108 S.Ct. 108, 98 L.Ed.2d 68 (1987), Rios and the mother of his child met in New Mexico in 1975, and subsequently, they lived together as man and wife. In 1977, a child was born of this union. In 1979, they were married in New Mexico but divorced the following year. The mother was granted custody of their child with Rios retaining reasonable visitation rights. This situation progressed satisfactorily until the summer of 1984 when the mother informed Rios that she and her new husband were moving to Wyoming. Rios took custody of the child in New Mexico for the summer, as agreed to by the parties, with the understanding the child would be returned to the mother in Wyoming by August 14, 1984. On that day, Rios telephoned his ex-wife asking for a few more days and she agreed. Rios did not return the child to his mother on the

day stipulated. Her efforts to locate the child, despite assistance from police authorities in New Mexico, proved fruitless. At that juncture, the mother filed a criminal complaint against Rios in Wyoming, charging him with the statutory crime of interfering with child custody. In July of 1985, Rios was apprehended as he attempted to cross the border from California into Mexico. The child was located in Los Angeles and reunited with his mother in Wyoming.

The court, acknowledging that Wyoming did not have a specific statute which permitted the exercise of jurisdiction when extraterritorial criminal conduct caused an intended result within the state, looked to the common law rule and upheld the jurisdiction of Wyoming courts to entertain the custody interference prosecution. *Id.* at 249.

In *Roberts v. State*, 619 S.W.2d 161 (Tex.Crim.App.1981), the defendant retained her grandchild, who was under the age of 18, in Colorado in direct violation of a custody order of a Texas Court. Roberts was charged and convicted under V.T.C.A. Penal Code, § 25.03, which provided:

"(a) A person commits an offense if he takes or retains a child younger than 18 years out of this state when he:

(1) knows that his taking or retention violates a temporary or permanent judgment or order of a court disposing of the child's custody; or

(2) has not been awarded custody of the child by a court of competent jurisdiction and knows that a suit for divorce, or a civil suit or application for habeas corpus to dispose of the child's custody, has been filed."

The court, in upholding the jurisdiction of a Texas court to entertain that prosecution, relied on the language in V.T.C.A. Penal Code, § 1.04, which provides in part:

"(a) This state has jurisdiction over an offense that a person commits by his own conduct or the conduct of another for which he is criminally responsible if:

(1) either the conduct or a result that is an element of the offense occurs inside this state;"

The courts of three other states have rejected the view that child abduction or custody interference prosecutions can be heard in the state where the parental custody has been deprived by acts or omissions which occurred outside the state. *People v. Gerchberg*, 131 Cal.App.3d 618, 181 Cal.Rptr. 505 (1982); *State v. McCormick*, 273 N.W.2d 624 (Minn.1978); *State v. Cochran*, 96 Idaho 862, 538 P.2d 791 (Idaho 1975). We do not find them persuasive.

### (2)

Finally, the argument by Marcus that she could not be convicted under Article 27, § 2 as an accessory to Trindle proceeds on a faulty premise; she was not convicted of that crime as an accessory but as a principal. The evidence fully supported that conviction. She participated with her accomplice, Trindle, in the preparation for and consummation of the plan to "secrete and harbor" Matthai's children from her lawful custody. In doing so, she was guilty of criminal conduct expressly punishable by Article 27, §`2, and was properly convicted thereunder.

JUDGMENTS AGAINST APPELLANT, WILLIAM ORVILLE TRINDLE III, VACATED; CASE REMANDED TO THE CIRCUIT COURT FOR KENT COUNTY WITH DIRECTION TO DISMISS THE CRIMINAL INFORMATION FILED AGAINST TRINDLE AS MOOT. JUDGMENTS AGAINST SHARON MARCUS AFFIRMED; COSTS TO BE PAID BY APPELLANT, SHARON MARCUS.

ELDRIDGE, Judge, concurring in part and dissenting in part:

I agree with the majority's decision vacating Trindle's convictions on the ground of mootness. I dissent, however, from the affirmance of Marcus's convictions under Maryland Code (1957, 1992 Repl.Vol.), Art. 27, § 2.[1] I do not

---

1. Art. 27, § 2, first enacted as Ch. 324 of the Acts of 1876, provides as follows:

believe that the Circuit Court for Kent County or any Maryland court had jurisdiction to entertain a prosecution of Marcus for violating Art. 27, § 2, under the circumstances here. The affirmance of Marcus's convictions is inconsistent with settled Maryland common law principles, with Article 20 of the Maryland Declaration of Rights, and with the Constitution of the United States.

As reiterated by this Court on numerous occasions, "under the common law ... a state may punish only those crimes committed within its territorial limits." *Pennington v. State,* 308 Md. 727, 730, 521 A.2d 1216, 1217 (1987). *See, e.g., Urciolo v. State,* 272 Md. 607, 640, 325 A.2d 878, 897 (1974) ("An offense against the laws of this State is punishable only when the offense is committed within its territory"); *Goodman v. State,* 237 Md. 64, 67, 205 A.2d 53, 54 (1964); *Breeding v. State,* 220 Md. 193, 200, 151 A.2d 743, 747 (1959) ("the State of Maryland cannot punish for a crime committed in another state"); *Bowen v. State,* 206 Md. 368, 375, 111 A.2d 844, 847 (1955) ("Of course, an offense against the laws of the State of Maryland is punishable only when committed within its territory. A person cannot be convicted here for crimes committed in another

---

"Any person who shall without the color of right forcibly abduct, take or carry away any child under the age of twelve years from the home or usual place of abode of such child, or from the custody and control of the parent or parents, or lawful guardian or guardians of such child, or be accessory thereto, or who shall without such color of right and against the consent of the parent or parents or lawful guardian or guardians of such child, persuade or entice from the usual place of abode or house of such child, or from the custody and control of the parent or parents, or guardian or guardians of such child, or be accessory thereto, or shall knowingly secrete or harbor such child, or be accessory thereto, with the intent to deprive such parent or parents, guardian or guardians, or any person who may be in lawful possession of such child, of the custody, care and control of such child, shall be guilty of a felony, and upon conviction shall suffer imprisonment in the penitentiary for a term not exceeding twenty years, in the discretion of the court.

"For the purposes of this section, the terms 'usual place of abode', 'home', and 'house' include the real property appurtenant thereto."

state"); *Stout v. State,* 76 Md. 317, 25 A. 299 (1892); *Worthington v. State,* 58 Md. 403 (1882).

The same principle is embodied in Art. 20 of the Maryland Declaration of Rights, which, in addition, grants to a criminal defendant the right ordinarily to be tried in the county where the crime was committed.[2] *Greco v. State,* 307 Md. 470, 474, 515 A.2d 220, 222 (1986); *Lodowski v. State,* 302 Md. 691, 707, 490 A.2d 1228, 1236 (1985), *vacated and remanded on other grounds,* 475 U.S. 1078, 106 S.Ct. 1452, 89 L.Ed.2d 711 (1986) ("ordinarily a Grand Jury may not indict and a State's Attorney may not try an accused in a jurisdiction outside the county in which the offense took place").

Moreover, the Sixth Amendment to the Constitution of the United States, made applicable to state judicial proceedings by the Fourteenth Amendment, requires that "in all criminal prosecutions, the accused shall enjoy the right to a ... trial, by an impartial jury of the State ... wherein the crime shall have been committed...." *See Williams v. Florida,* 399 U.S. 78, 93–96, 90 S.Ct. 1893, 1902–1904, 26 L.Ed.2d 446, 456–458 (1970); *Lodowski v. State, supra,* 302 Md. at 708, 490 A.2d at 1236–1237. A state may not, consistent with the Sixth Amendment, try an accused for a crime committed entirely in another state. *See, e.g., Lane v. State,* 388 So.2d 1022, 1028–1029 (Fla.1980); *State v. Smith,* 421 N.W.2d 315, 318–320 (Minn.1988); *Mississippi Publishers Corp. v. Coleman,* 515 So.2d 1163, 1165, 1166 (Miss.1987); *State v. Preite,* 172 Mont. 318, 321–325, 564 P.2d 598, 600–602 (1977); *State v. Darroch,* 305 N.C. 196, 201–210, 287 S.E.2d 856, 860–865, *cert. denied,* 457 U.S. 1138, 102 S.Ct. 2969, 73 L.Ed.2d 1356 (1982); *State v. Beuke,* 38 Ohio St.3d 29, 42, 526 N.E.2d 274, 288 (1988), *cert. denied,* 489 U.S. 1071, 109 S.Ct. 1356, 103 L.Ed.2d 823

---

**2.** Art. 20 of the Declaration of Rights states as follows:
    **"Article 20. Trial of facts where they arise.**
      "That the trial of facts, where they arise, is one of the greatest securities of the lives, liberties and estate of the People."

(1989); *State v. Harrington,* 128 Vt. 242, 251, 260 A.2d 692, 698 (1969); *State v. Moore,* 189 Wash. 680, 689–693, 66 P.2d 836, 840–842 (1937).

Even before the Sixth Amendment was held applicable to state proceedings, it was implicit that, under the federal system created by the United States Constitution, a state such as Maryland had no territorial jurisdiction over an offense committed in another state, even if that offense may have had some "effects" in Maryland. Thus in *Cohens v. Virginia,* 6 Wheat. 264, 428, 5 L.Ed. 257, 297 (1821), the Chief Justice, referring to the offense of misprison of felony, stated:

> "It is equally clear that a State legislature, the State of Maryland for example, cannot punish those who, in another State, conceal a felony committed in Maryland."

*See also Nielsen v. Oregon,* 212 U.S. 315, 322, 29 S.Ct. 383, 385, 53 L.Ed. 528, 530 (1909).

Where all of the elements of criminal offense take place outside of Maryland, in another state or in other states, it is clear under the previously cited authorities that a Maryland court has no jurisdiction over that offense. *See,* in particular, *Pennington v. State, supra,* 308 Md. at 730–732, 521 A.2d at 1217–1218, and the authorities there reviewed.[3]

As pointed out by Judge Smith for the Court in the *Pennington* case, however, "[i]f the various *elements* of a given offense do not occur within the borders of a single state, it becomes necessary to decide in which state or states the offense has been 'committed.'" *Ibid.,* emphasis added. Thus, it is only when an element or essential part of an offense takes place within Maryland that there is any basis for possible Maryland jurisdiction. *See, e.g., Urciolo*

---

3. The principle that a state has no jurisdiction to punish offenses committed outside of the state applies to offenses committed within the states and territories of the United States. Where, however, an offense is committed on the high seas or otherwise outside of the United States, different principles are applicable. *See Skirotes v. State of Florida,* 313 U.S. 69, 61 S.Ct. 924, 85 L.Ed. 1193 (1941). *See also United States v. Columba-Colella,* 604 F.2d 356 (5th Cir.1979).

*v. State, supra,* 272 Md. at 636 n. 17, 325 A.2d at 895 n. 17 ("it is necessary 'to discriminate with great care between acts essential to the crime and acts merely incidental thereto' "); *Goodman v. State, supra,* 237 Md. at 66, 205 A.2d at 54 ("The crime consists of two elements: the criminal intent and the act. Here, the criminal intent was formed in Maryland, but the proscribed act took place in Washington, D.C."); *Peddersen v. State,* 223 Md. 329, 333, 164 A.2d 539, 542 (1960) ("there is evidence … that both of these elements [of the offense] occurred in this State"); *Bowen v. State, supra,* 206 Md. at 375, 111 A.2d at 847 (referring to place where the "essential element in the crime" occurred); *Stout v. State, supra,* 76 Md. at 325–326, 25 A. at 302.

Judge Smith in *Pennington v. State, supra,* 308 Md. at 730–733, 521 A.2d at 1217–1219, went on to explain that, in the situation where the elements of an offense occur in different states, and in the absence of any statute expanding common law territorial jurisdiction in criminal cases, courts look to a particular element, or certain particular elements, of an offense in order to determine the situs of that offense. For example, in *Stout v. State, supra,* 76 Md. at 323–328, 25 A. at 301–302, involving the crime of murder, where the mortal blow was struck in one state but death occurred in another state, this Court held that the state in which the blow was struck, and not the state where death occurred, had jurisdiction to try the defendant.

In *Bowen v. State, supra,* 206 Md. at 375–379, 111 A.2d at 847–849, involving the theft of real estate settlement moneys, the Court held that the place having jurisdiction to prosecute for larceny after trust was the District of Columbia where the conversion took place, and the place having jurisdiction to prosecute for embezzlement was also the District of Columbia where the intent to appropriate was formed and where the appropriation took place. The Court in *Bowen* held that Maryland, where the settlement took place, where the moneys were received, and where the property and the victims were located, had no jurisdiction to prosecute either offense. To the same effect, *see Urciolo v.*

*State, supra.* In *Goodman v. State, supra,* the defendant was charged in the Circuit Court for Montgomery County, Maryland, under a statute making it an offense to obtain or procure a narcotic drug by, *inter alia,* misrepresentation or alteration of a prescription or by use of a false name. The defendant, by misrepresentations and by using a false name, obtained from a physician in Montgomery County a prescription for a narcotic drug, and he had the prescription filled in the District of Columbia. Despite the occurrence of some elements of the crime in Maryland, *i.e.,* the criminal intent and misrepresentations, this Court held that the Maryland court lacked jurisdiction because the critical element or gravamen of the crime was the obtention of the narcotic drug which took place in the District of Columbia. *See also Frye v. State,* 62 Md.App. 310, 489 A.2d 71, *cert. denied,* 303 Md. 618, 495 A.2d 837 (1985).

The Court in *Pennington v. State, supra,* 308 Md. at 728–729, 521 A.2d at 1216–1217, observed that some states have enacted statutes expanding territorial jurisdiction over criminal cases but that Maryland has not enacted such a statute. Moreover, even under these statutes, some *element* or essential part of the offense ordinarily must occur within a state in order for that state to exercise jurisdiction over the offense. Thus, in *State v. Smith, supra,* 421 N.W.2d 315, involving a very broad territorial jurisdiction statute, the Supreme Court of Minnesota reversed a murder conviction where the victim's body was found in Minnesota but where the elements of the offense, including the death, all apparently occurred outside of Minnesota. The court stated (421 N.W.2d at 318–319):

"Both the Minnesota and the United States Constitutions preserve the theory of territorial jurisdiction to some degree....

[T]he Sixth Amendment to the United States Constitution provides the right to a trial in 'the state and district *wherein the crime shall have been committed.'* (emphasis added). By use of the term 'committed,' both Consti-

tutions evidence an intent to maintain some form of territorial jurisdiction.

"Statutes have been enacted in the various states that broaden the common law concept of territorial jurisdiction. These statutes basically have allowed a state to assume jurisdiction where *any* element of the crime was committed within its borders.... [A] state may now assume jurisdiction where the result or effect of the crime occurred within its boundaries. Thus, the state where a victim died (*i.e.*, the result or effect of the murder) can assert jurisdiction over the murder under modern statutes.

&ast; &ast; &ast; &ast; &ast; &ast;

"However, even under the broad, modern statutes, some territorial aspects of jurisdiction remain. In order to withstand constitutional attack, *some operative event, a triggering event if you will, must occur within the jurisdiction for the court to have power to act.* The event needed, as required by the Minnesota and United States Constitutions, is that some part of the crime charged must be 'committed' within the jurisdiction." (Emphasis supplied).

After discussing the existing Minnesota statue, the court went on (*id.* at 319–320):

"However, the statute still requires that some territorial event be committed in Minnesota to confer jurisdiction. In [*State v.*] *McCormick* [, 273 N.W.2d 624 (Minn.1978) ], we expressly held that this statute does not totally abrogate 'the limitations on extraterritorial jurisdiction which have long been recognized as the law of the land.' 273 N.W.2d at 625. On this basis, the court struck down a statute that made totally extraterritorial activity a crime in Minnesota. *Id.* 273 N.W.2d at 625. We agree with appellant in this case that under *McCormick*, an attempt to exercise totally extraterritorial jurisdiction is contravened both by state and federal constitutional principles. Only if some part of the crime was committed within the

State of Minnesota does the state have jurisdiction to punish the crime."

Because "no act comprising the murder was committed in Minnesota" (*id.* at 320), the court overturned the murder conviction.

Numerous other cases are to the same effect, namely that even under statutes expanding common law territorial jurisdiction over criminal offenses, some element or essential part of the offense must take place in the state for that state to have territorial jurisdiction. *See, e.g., United States v. Lombardo,* 241 U.S. 73, 78, 36 S.Ct. 508, 510, 60 L.Ed. 897, 898 (1916) ("where a crime consists of distinct parts which have different localities the whole may be tried where any part can be proved to have been done"); *United States v. Columba–Colella,* 604 F.2d 356, 360 (5th Cir. 1979); *People v. Gerchberg,* 131 Cal.App.3d 618, 620, 181 Cal.Rptr. 505, 506 (1982) ("California cannot punish for conduct taking place outside of California unless the defendant has, within this state, committed acts which amount to at least an attempt to commit a crime punishable under California law"); *Lane v. State, supra,* 388 So.2d at 1027 (statute "allows Florida jurisdiction over offenses committed partly within the state when conduct that is an element of the offense occurs within the state, or the 'result' that is an element occurs within the state"); *State v. Preite, supra,* 172 Mont. at 325, 564 P.2d at 602 ("The State failed to prove that any element of the crime charged occurred in [the jurisdiction]. Under the authorities heretofore noted, this is fatal to the State's case"); *People v. Werblow,* 241 N.Y. 55, 61, 148 N.E. 786, 789 (1925) (Cardozo, C.J.: "We are now asked ... to hold that a conspiracy formed in New York gives jurisdiction under the statute to punish for a larceny abroad, if only some overt act can be found to have been here committed in furtherance of the conspiracy, even though the act is not a constituent of the executed larceny. Such a reading of the statute strains it to the breaking point. We think a crime is not committed either wholly or partly in this state, unless the act within this state is so

related to the crime that if nothing more had followed, it would amount to an attempt"). *See also, e.g., State v. Palermo*, 224 Kan. 275, 277, 579 P.2d 718, 720 (1978); *State v. Harrington, supra*, 128 Vt. at 249–250, 260 A.2d at 696–697; *State v. Moore, supra*, 189 Wash. at 689–693, 66 P.2d at 840–842.

Applying the foregoing principles to the case at bar compels the conclusion that Maryland lacks territorial jurisdiction to prosecute and punish Marcus under Art. 27, § 2. In dealing with this issue, it is important to keep in mind that Marcus was convicted under the 1876 child abduction statute, Art. 27, § 2, and not under Code (1984), § 9–305 of the Family Law Article.[4] It also should be remembered that Maryland has not enacted a statute expanding common law territorial jurisdiction over criminal cases generally, *Pennington v. State, supra*, 308 Md. at 729, 521 A.2d at 1216–1217, although even if there were such a statute, a Maryland court would lack jurisdiction to prosecute Marcus under Art. 27, § 2, on the facts of this case.

Art. 27, § 2, covers three different situations, *i.e.*, forcibly abducting a child under twelve, persuading or enticing a child under twelve from the child's usual place of abode or from the custody of the parents, or knowingly secreting or harboring a child under twelve with the intent of depriving the parents or guardians of possession or custody. As pointed out in the majority opinion, the third situation is pertinent here. Marcus was convicted as a principal, and not an accessory, under that portion of the statute punishing one who "shall knowingly secrete or harbor such child ... with the intent to deprive such parent or parents ... of the custody, care and control of such child...." The gist or gravamen of the offense is knowingly secreting or har-

---

4. Whether, on the facts of this case, Marcus's conduct fell within the prohibition of § 9–305, and, if so, whether § 9–305 could constitutionally be applied to Marcus under the circumstances, are issues not presented by the instant case.

boring the child; the two principal elements are knowingly secreting or harboring the child and the requisite intent.

The conduct by Marcus which allegedly constituted the secreting or harboring of the children, and Marcus's alleged criminal intent in so doing, may have occurred in Pennsylvania, may have occurred in Delaware, may have occurred in New Jersey while Marcus, Trindle and the children were en route from Pennsylvania to the airport in New York, and may have occurred in New York.[5] Furthermore, even if an omission could be deemed to be the proscribed secreting or harboring, *i.e.*, if the failure to turn over the children to their mother at the time and place the children were supposed to be turned over to their mother were deemed the unlawful secreting or harboring, the situs of such omission was either Philadelphia, Pennsylvania, or Wilmington, Delaware.[6] What is clear is that neither the proscribed acts nor the requisite intent occurred in Maryland. As far as we know, Marcus had never been in Maryland until she was brought here for the present criminal prosecution. Furthermore, no agent performed the proscribed acts in Maryland on behalf of Marcus. Under our cases, as well as the decisions elsewhere, Maryland had no territorial jurisdiction over Marcus's alleged violation of Art. 27, § 2. *See, e.g., Urciolo v. State, supra*, 272 Md. at 623–640, 325 A.2d at 887–897 (as the "gravamen of the offense" of embezzlement was the appropriation coupled with the criminal intent which occurred elsewhere, Maryland lacked jurisdiction); *Goodman v. State, supra*, 237 Md. at 66–67, 205 A.2d at 54 (because the "proscribed act took place" outside of Maryland, a Maryland court had no jurisdiction); *Bowen v. State, supra*, 206 Md. at 375–379, 111 A.2d at 847–849.

---

**5.** There is no indication in this record that the authorities in these states, and particularly in Pennsylvania, were unwilling to prosecute Marcus.

**6.** The facts of the case, expressly agreed to by the State in its brief (appellee's brief, p. 3), are that the children were supposed to be delivered to their mother either at the train station in Philadelphia, Pennsylvania, or at the train station in Wilmington, Delaware.

As previously indicated, even if Maryland had one of the typical statutes generally expanding common law territorial jurisdiction in criminal cases, such statute would not assist the State's position in the present case. Not a single element or part of the Art. 27, § 2, offense charged in this case had a situs in Maryland. Neither an act which is an element of the offense nor an effect which is an element of the offense occurred in Maryland.

Under the facts of this case, the only "connections" with Maryland were that the children's mother who had custody was a resident of Maryland, the children therefore normally resided in Maryland, and the mother had custody pursuant to a Maryland court order. None of these factors is an element or part of the Art. 27, § 2, offense charged in this case.

The language of the statute makes the normal residence of the child relevant only under two of the alternatives covered by the first two parts of the statute, namely where the child is abducted from the child's usual place of abode or is enticed away from the child's usual place of abode. Marcus was not charged with abducting the children from or enticing them to leave their Kent County home. If she had been, and if the evidence had supported such a charge, Maryland would obviously have territorial jurisdiction, for Marcus would have committed an act within Maryland which would have constituted the gravamen of the offense.

With respect to the other alternatives covered by the statute, *i.e.*, abducting a child from the custody of the parent, enticing the child from the custody of the parent, or knowingly secreting or harboring the child to deprive the parent of possession (which is the portion of the statute under which Marcus was charged), the residency of the child and of the parent are irrelevancies. For example, if a mother and child who are residents of Virginia happen to be in Maryland temporarily, shopping at a Maryland shopping center, and if the child is abducted at that shopping center, or enticed to go away with the defendant, or leaves with the defendant who secretes or harbors the child someplace in

Maryland, and if the defendant's intent is to deprive the mother of her lawful custody or possession of the child, the defendant may be prosecuted in Maryland under Art. 27, § 2, despite the Virginia residency of the mother and child. Unlike § 9–305 of the Family Law Article, residency or location is simply not an element or part of the Art. 27, § 2, offense charged in this case. Similarly, whether the mother had lawful custody of the child pursuant to a Maryland court order, or pursuant to a Virginia court order, or pursuant to any court order, is an irrelevancy. Most parents have lawful custody of their minor children without there ever having been a court order; nevertheless, those parents and children are protected by Art. 27, § 2. The basis for a parent's custody is not an element of the Art. 27, § 2, offense.

The majority primarily relies on *Pennington v. State, supra,* 308 Md. 727, 521 A.2d 1216. *Pennington,* however, furnishes no support for the majority's position; in fact, the principles set forth in that opinion would require a reversal here. In the *Pennington* case, Jean Pennington was charged and convicted in the Circuit Court for Baltimore City of obstruction of justice. The charge was based on her having stabbed another woman, in the District of Columbia, in order to dissuade the woman from testifying in a criminal case then pending in Baltimore City. This Court upheld the jurisdiction of the Circuit Court for Baltimore City, applying the principle that a state where the result of conduct occurs may have jurisdiction "where causing a particular result constitutes *an element* of the offense," *Pennington v. State, supra,* 308 Md. at 733, 521 A.2d at 1219, emphasis added. The Court also relied on 1 LaFave and Scott, *Substantive Criminal Law* § 2.9, at 180–181 (1986), that the situs of a crime at common law may be " 'the place of the result if the definition of the crime includes such a result.' " *Pennington,* 308 Md. at 730–731, 521 A.2d at 1218–1219. The *Pennington* Court then pointed out that "causing or attempting to cause a particular result—the obstruction of justice—forms an *essential ingredient* of the

offense here involved." 308 Md. at 734, 521 A.2d at 1219, emphasis added. The Court concluded that the obstruction of justice in Maryland was the most important element of the offense (308 Md. at 735, 521 A.2d at 1219), and in fact was the "gravamen" of the offense, saying (308 Md. at 739, 521 A.2d at 1221–1222):

> "The stabbing here constituted two crimes, the assault and the obstruction of justice. The first, which trammeled upon the woman's rights, was an offense against District of Columbia law. However, in the second, the obstruction of justice, as in *Grindstaff* [*v. State,* 57 Md.App. 412, 470 A.2d 809, *cert. denied,* 299 Md. 655, 474 A.2d 1344 (1984)], no individual's rights were trammeled upon, but the offense is against the State itself. It thus would appear to make sense to view the gravamen ... as being the injury to the State and to conclude that jurisdiction exists where the offended agency of the State is located."

It was because the *Pennington* Court held that Maryland was the situs of the critical element or gravamen of the offense that the jurisdiction of the Circuit Court for Baltimore City was upheld. In the case at bar, on the other hand, the gravamen of the offense did not occur in Maryland. Moreover, unlike *Pennington,* no element of the offense took place in Maryland. There was no result in Maryland which constituted an element or part of the Art. 27, § 2, offense which was charged in this case.

The majority also relies on several child abduction cases from other jurisdictions. The cases from other jurisdictions, however, do not support the majority's position in the present case. The majority opinion principally relies on *People v. Harvey,* 174 Mich.App. 58, 435 N.W.2d 456 (1989). The *Harvey* case did not involve a statute like Art. 27, § 2. Instead, the prosecution was under a newly enacted statute which provided as follows (174 Mich.App. at 60, 435 N.W.2d at 457, emphasis added by the Michigan court):

> "An adoptive or natural parent of a child shall not take that child, *or retain* that child for more than 24 hours,

with the intent to detain or conceal the child from any other parent or legal guardian of the child who has custody or visitation rights pursuant to a lawful court order at the time of the taking *or retention....*"

Consequently, retention of the child in violation of a court custody order was an element of the offense; it was the gravamen of the offense. Furthermore, the facts of the *Harvey* case are different from those in the case at bar. In *Harvey*, a Michigan court had issued an order granting custody of the child to its mother. The defendant, who was the child's father, took the child in Michigan for visitation and was supposed to return the child to the child's mother in Michigan. Instead, the defendant "absconded with the child and went to Colorado and elsewhere." 174 Mich.App. at 60, 435 N.W.2d at 456–457. He failed to return the child to the mother in Michigan. The Michigan appellate court, in upholding Michigan jurisdiction over the defendant, applied the same principle which this Court had invoked in *Pennington*, namely that where certain conduct produces an effect or result which is a critical element of the crime, and where that effect or result occurs within a state, such state may assert territorial jurisdiction. The court made it clear that the defendant's failure to return the child to her mother *in Michigan, in violation of the court order,* constituted that "which was made criminal by the enactment of" the statute. 174 Mich.App. at 61, 435 N.W.2d at 457. As previously discussed, Art. 27, § 2, does not contain the elements which were critical parts of the offense involved in the *Harvey* case. In addition, the situs of the "failure to return the child" in the present case was not Maryland; it was Pennsylvania or Delaware.

*Wheat v. State,* 734 P.2d 1007 (Alaska App.1987); *Roberts v. State,* 619 S.W.2d 161 (Tex.Cr.App.1981); and *Rios v. State,* 733 P.2d 242 (Wyo.), *cert. denied,* 484 U.S. 833, 108 S.Ct. 108, 98 L.Ed.2d 68 (1987), relied on in the majority opinion, are all like the *Harvey* case. None of these three cases involved statutes like Art. 27, § 2. Two of the three cases were in jurisdictions where the legislature had ex-

panded common law principles of territorial jurisdiction. In all three of these cases, the defendant was a noncustodial parent who was supposed to return the child to the custodial parent *in the forum state* and who failed to do so. In each of the three cases, the failure, in violation of a custody order, to return the child to the custodial parent in the forum state, was an element or critical part of the criminal offense. Thus, the Alaska court in *Wheat*, 734 P.2d at 1009, specifically relied on the principle that

"[w]here, however, a statute, in addition to prohibiting conduct, *includes within its definition of the offense a specific result*, then the crime is not completed until that result occurs. And if the prohibited result occurs in a place other than the conduct which occasioned it, the location of the result may fairly be deemed the place where the crime is 'consummated.'" (Emphasis added).

In the *Roberts* case, *"retaining a child outside the state either in violation* of a custody award ... or to defeat the court's jurisdiction in a custody case" was the gravamen of the statutory offense, 619 S.W.2d at 162, emphasis in the original. The Wyoming court in *Rios* specifically invoked the principle that if "some element or part of the criminal offense was committed within the state," the state can exercise territorial jurisdiction, 733 P.2d at 247. *See also People v. Caruso*, 119 Ill.2d 376, 386, 116 Ill.Dec. 548, 519 N.E.2d 440, 444 (1987), *cert. denied*, 488 U.S. 829, 109 S.Ct. 83, 102 L.Ed.2d 59 (1988) (detaining a child in violation of "any terms of a valid court order" and "removing the child from the jurisdiction of the court" were express statutory elements of the offense).

To reiterate, the failure to return a child to Maryland, in violation of a court order, is not an element of the Art. 27, § 2, offense charged in this case. Furthermore, in the present case, the children were not supposed to be returned to their mother in Maryland; they were to be returned to their mother in Philadelphia, Pennsylvania, or Wilmington, Delaware. The legal principles applied in the cases relied on by the majority require the conclusion that Maryland

lacked territorial jurisdiction over the Art. 27, § 2, offense with which Marcus was charged.[7]

Other child abduction cases confirm that, at a minimum, some element of the offense must occur in the state for that state to exercise jurisdiction. For example, *Addis v. State*, 404 N.E.2d 59 (Ind.App.1980), involved a prosecution of two children's non-custodial parent under the portion of a statute punishing one who "confines" a child or other person without consent. In *Addis*, the children usually lived with their custodial parent (their father) in Indiana; they were visiting the defendant (their mother) in Florida; the defendant was supposed to return the children to their father in Indiana on a particular date, and the defendant failed to return the children to Indiana when she was supposed to. In holding that Indiana had no territorial jurisdiction to punish the defendant for unlawfully "confining" the children, the Indiana court stated (404 N.E.2d at 64):

> "What Mrs. Addis did ... was fail to return the children to their father. All of her actions took place outside this state. We are of the opinion it would, indeed, torture the express language of the statute to hold Mrs. Addis' actions in Florida constituted a nonconsensual confinement subject to our jurisdiction. It appears none of the constituent elements of the charged offense took place in Indiana...."

If one substitutes "secreting" or "harboring" for "confining," the Indiana statute is very similar to the portion of Art. 27, § 2, under which Marcus was charged. In neither case did an element of the offense, as defined in the statute,

---

7. As the majority opinion points out, there are other cases contrary to the *Harvey*, *Wheat*, *Roberts* and *Rios* decisions. In several jurisdictions, even where the retention of a child out of state, in violation of a court order, are express elements of the statutory offenses, the courts take the position that the state has no jurisdiction when the defendant's wrongful conduct occurred entirely in another state. *See, e.g., People v. Gerchberg*, 131 Cal.App.3d 618, 181 Cal.Rptr. 505 (1982); *State v. McCormick*, 273 N.W.2d 624 (Minn.1978). Under the principles applied in either line of cases, Maryland would have no jurisdiction in the case at bar.

occur in the forum state. In the present case, of course, there is even less basis for jurisdiction in the forum state, as the children were not supposed to be returned to Maryland. *See also State v. Cochran*, 96 Idaho 862, 538 P.2d 791 (1975) (continued retention of children out of the forum state, beyond the date on which they were to be returned to the Department of Social Services in the forum state, could not be prosecuted under the state's kidnapping statute, as no element of the offense occurred in the forum state).

Finally, the majority relies upon the proposition that Marcus's conduct "had its effect in Kent County, Maryland." As previously discussed, however, a state may have jurisdiction over an offense where the defendant's acts took place elsewhere, but where an effect or result occurred within the state, only in the situation "where causing a particular result constitutes an element of the offense," *Pennington v. State, supra*, 308 Md. at 733, 521 A.2d at 1219. In other words, "the situs of a crime [is] the place of the result where the definition of a crime ... includes such a result," *Pennington*, 308 Md. at 746, 521 A.2d at 1225. The majority has not, and can not, explain how the "effect" in Kent County, Maryland, is a statutory element of the Art. 27, § 2, offense charged here.

What the majority is actually holding is that whenever criminal conduct outside of Maryland has an impact or effect in Maryland, the State of Maryland can assert criminal jurisdiction. No case, to the best of my knowledge, supports such a principle; numerous cases expressly reject it. As Judge Wisdom stated for the court in *United States v. Columba–Colella, supra*, 604 F.2d at 360, "that an act affects the citizen of a state is not a sufficient basis for that state to assert jurisdiction over the act." *See also People v. Werblow, supra*, 241 N.Y. at 68, 148 N.E. at 792 (Cardozo, C.J., referring to a statute expanding common law principles of territorial jurisdiction, stated that the statute did not "bring within our jurisdiction every criminal act committed in another state which in its consequences might affect ... someone residing within our borders").

In several Maryland cases, where criminal acts outside of Maryland had effects in Maryland, this Court held that Maryland lacked territorial jurisdiction. *See, e.g., Urciolo v. State, supra,* 272 Md. at 636, 325 A.2d at 895 (effect or result in Maryland must represent "the consummation or completion of the crime within this state" and must be "essential to the crime"); *Goodman v. State, supra; Bowen v. State, supra.* Under the theory espoused by the majority today, in *Pennington v. State, supra,* Maryland would have had jurisdiction to prosecute the defendant for assault as well as for obstruction of justice; this Court, however, made it clear that the District of Columbia was the situs of the assault, 308 Md. at 739, 521 A.2d at 1221. Also under the majority's theory, if a Maryland court awards custody of a child to the mother who resides in Maryland, and if the child, while on vacation in California, is murdered in California by a Californian, Maryland would have jurisdiction over the homicide because it deprived a Maryland resident of a child who was in her custody under a Maryland court order.

The majority's holding, that this State may assert criminal jurisdiction over an offense when all of the elements of that offense occur in other states, simply because there are "effects" within this State, represents an unprecedented expansion of state territorial jurisdiction over criminal cases. It could lead to friction among states and overtax the criminal justice resources of this State. It would lead to trials of defendants in jurisdictions far away from where the offenses were actually committed, in violation of the Maryland Declaration of Rights and the Sixth Amendment.[8]

---

**8.** It should be noted that, whereas the offense in the present case occurred in adjacent or nearby jurisdictions, essentially the same scenario could have occurred in states on the west coast, and involving air travel rather than train travel. Thus, Trindle and Marcus could have lived in California, and, under the arrangement with the children's mother, the defendants may have been required to place the children on an airplane at the San Francisco airport, with the airplane bound for Dulles airport in Northern Virginia where the children's mother would meet them.

Such a practice was one of the grievances which led to the American Revolution and led to the constitutional provisions requiring that the trials of alleged offenses be in the states where they were committed.[9]

I would reverse Marcus's convictions on the ground that the Circuit Court for Kent County lacked jurisdiction.[10]

Judges Rodowsky and Smith have authorized me to state that they concur with the views expressed herein.

---

**9.** *See* The Declaration of Independence, where one of the complaints against the King was that he had assented to legislation "For transporting us beyond Seas to be tried for ... Offences...."

**10.** Since I would reverse for lack of territorial jurisdiction, I do not express any view on the majority's holding that Marcus's conduct was encompassed by Art. 27, § 2. I do note, however, that the Department of Legislative Reference's file relating to the passage of § 9–305 of the Family Law Article indicates an intent on the part of some members of the General Assembly that the matter of child abductions by noncustodial parents was exclusively covered by the Family Law Article and that Art. 27, § 2, was inapplicable to such situations.